455 A.2d 135

**ROYAL INDEMNITY COMPANY,**

v.

**Kenneth L. ADAMS and Marion J. Adams,**

**and**

**Aetna Life and Casualty Life Insurance Company.**

**Appeal of AETNA LIFE AND CASUALTY LIFE INSURANCE COMPANY.**

Superior Court of Pennsylvania.

Argued Dec. 5, 1980.

Filed Jan. 7, 1983.

Petition for Allowance of Appeal
Denied Sept. 7, 1983.

Alvin B. Lewis, Jr., Lancaster, for appellant.

Richard L. Kearns, Harrisburg, for Royal, appellee.

Anthony Schimaneck, Lancaster, for Adams, et al., appellees.

Before HESTER, CAVANAUGH and VAN der VOORT, JJ.

VAN der VOORT, Judge:

This appeal is another in a long series of appeals involving the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 P.S. 1009.101, et seq. (Hereafter referred to as the No-Fault Act). The instant appeal raises a very novel question: does a No-Fault policy remain in effect after the listed insured vehicle is no longer owned by the named insured and he has failed to make the required premium payments. To properly frame this issue, it is first necessary to gain an insight into the factual development of this case.

Kenneth Adams, a minor, co-owned with his father (Mr. Adams) a Chevrolet, which he sold on March 17, 1977. His insurance carrier was so notified. Subsequently, Adams purchased a 1969 Fiat,[1] his mother Marion Adams (Mrs. Adams) was listed as co-owner; and he acquired insurance through the Gross Agency. The initial payment was tendered and accepted. The Automobile Insurance Plan assigned this policy to Royal Indemnity; the policy period was from May 9, 1977 to May 9, 1978. The premium installments due on July 9, 1977, August 9, 1977, and September 9, 1977, were never paid. In August 1977, Adams sold his

---

1. At various places through the record and the briefs filed in this case the car is referred to as a 1970 or 1971 model.

Fiat; he did not advise either the Gross Agency or Royal Indemnity of such sale. On September 26, 1977, Adams was injured while riding as a passenger in a vehicle operated by Peter Hellinger. The Hellinger vehicle, as well as two owned by Mr. and Mrs. Adams were insured by Aetna Life and Casualty Insurance Company (hereafter referred to as Aetna).

The day after the accident, Royal Indemnity informed Adams that it was cancelling his policy with Royal Indemnity, effective October 12, 1977. On January 4, 1978, Royal sent a premium amendment notice to the Adams; the notice also stated that the policy had been cancelled October 12, 1977. Marion Adams sent a check to Royal for the amount due which was accepted and cashed. Royal later refunded the sum explaining it had been accepted in error. While investigating Mrs. Adams claim on behalf of her son, Kenneth Adams, Aetna discovered the existence of the Royal Indemnity policy. The September 26, 1978 accident came to Royal Indemnity's attention by way of the Gross Agency when such agency learned of it while dealing through another agency. Thereafter Marion Adams, prompted by inquiries from Royal Indemnity filed a claim on her son's behalf, with Royal Indemnity. Royal Indemnity denied the claim and petitioned for a declaratory judgment to determine which insurer should pay Adams' basic loss benefits. The lower court found for Royal Indemnity and against Aetna and this appeal followed.

Section 204 of the Act, 40 P.S. § 1009.204 states:

(a) Applicable Security—The security for the payment of basic loss benefits applicable to an injury to:

. . . .

(2) an insured is the security under which the victim or deceased victim is insured;

. . . .

An insured is defined by § 1009.103 as

(A) an individual identified by name as an insured in a contract of basic loss insurance complying with this act; and

(B) a spouse or other relative of a named insured, a minor in the custody of a named insured, and a minor in the custody of a relative of the named insured if—

(i) *not identified by name as an insured in any other contract of basic restoration insurance complying with this Act;* and

(ii) in residence in the same household with a named insured.

(Emphasis added)

When the above is applied to the parties at hand, the following situation results, Aetna as insurer of Mr. and Mrs. Adams is also insurer of Kenneth Adams, *unless* he is the identified named insured in another policy, which he was *if* the Royal Indemnity policy was in effect on September 26, 1977. The issue we must decide is straightforward: was the Royal Indemnity policy in effect on September 26, 1977, however the resolution of the issue is elusive. The lower court found that the fact that the insured vehicle was no longer owned by the insured was controlling and held that the Royal Indemnity Policy, was no longer in effect.

Appellant-Aetna views the current controversy as being two fold:

I.  Does the sale of the motor vehicle named in a no-fault insurance policy automatically terminate the whole policy?

II.  May a no-fault insurance policy be terminated by the company during its stated term without giving notice to the insured in accordance with the policy and statutory provisions?

## I.

■ The No-Fault Act does not address itself to the problem at hand. However in resolving this matter we must keep in mind the purposes of No-Fault. Section 1009.102(b) provides:

Therefore, it is hereby declared to be the policy of the General Assembly to establish at reasonable cost to the purchaser of insurance, a Statewide system of prompt

and adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims.

"Victim" is then defined as an individual who suffers an injury arising from the maintenance or use of a motor vehicle, § 1009.103.

Looking to the policy between Royal Indemnity and Adams we find that the policy contains three different coverages. Part A, liability coverage reads:

> We will pay damages for bodily injury or property damage for which any covered person becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted.

> "Covered person" as used in this Part means:

> 1. You or any family member for the ownership, maintenance or use of any auto or trailer.

> 2. Any person using your covered auto.

> 3. For your covered auto, any person or organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under this Part.

> 4. For any auto or trailer, other than your covered auto, any person or organization but only with respect to legal responsibility for acts or omissions of you or any family member for whom coverage is afforded under this Part. This provision applies only if the person or organization does not own or hire the auto or trailer.

> (Underscoring supplied).

Exclusion number 9, which is relevant, states that the insurer does not provide liability coverage:

> For the ownership, maintenance or use of any vehicle, other than your covered auto, which is owned by you or furnished or available for your regular use.

Under this provision, ownership of "your covered auto" is *not* necessary for coverage to attach under one and four above.

Likewise, Part B, medical payments coverage, the determination whether coverage attaches is dependent on the circumstances. That part of the policy reads:

> We will pay reasonable expenses incurred for necessary medical and funeral services because of bodily injury caused by accident and sustained by a covered person. We will pay only those expenses incurred within three years from the date of the accident.

> "Covered person" as used in this Part means:

> 1. You or any family member while occupying, or as a pedestrian when struck by, a motor vehicle designed for use mainly on public roads or by a trailer of any type.

> 2. Any other person while occupying your covered auto.

> (Underscoring supplied).

Under point 1. above, medical coverage is provided irregardless of the ownership of the vehicle involved; while under point 2. above, coverage is dependent on occupancy of the covered auto.

> Part C of the policy states as follows:

> We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by a covered person and caused by an accident. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured motor vehicle.

> Any judgment for damages arising out of a suit brought without our written consent is not binding on us.

> "Covered person" as used in this Part means:

> 1. You or any family member.

> 2. Any other person occupying your covered auto.

> 3. Any person for damages that person is entitled to recover because of bodily injury to which this cover-

age applies sustained by a person described in 1. or 2. above.

(Underscoring supplied)

"Covered person" is not, except for point 2 defined in terms of "covered auto."

In reading the insurance contract at hand, it becomes readily clear that coverage in many instances is independent of any connection or causal relationship with the "covered auto." We find support for this conclusion from other jurisdictions. In *Emick v. Dairyland Insurance Company*, 519 F.2d 1317 (4th Cir.1975), the court found that medical payment coverage and uninsured motorist coverage focus on the person rather than on his liability arising out of the operation of a particular vehicle. In contrast bodily injury liability coverage must arise from the ownership, maintenance, or use of an insured vehicle. Similarly, the Maryland Court of Appeals, in *Oarr v. Government Emp. Ins. Co.*, 39 Md.App. 122, 383 A.2d 1112 (1978) held that unlike medical payment and uninsured motorist coverage, liability insurance is directly related to and requires the involvement of an insured vehicle. The court held that the medical payment and uninsured motorist provisions were in the nature of a personal accident policy, while the liability provision was based on the automobile. Likewise in *Government Employees Insurance Company v. Sweet*, Fla.App., 186 So.2d 95 (1966), the medical payment coverage was found to be applicable to all injuries arising from an automobile accident (except when the insured was injured while occupying a car used regularly by him but not described in his policy). The public liability and property damage provisions were attributed to the vehicle causing the damages. Recovery for medical payments was deemed to be completely independent of liability on the part of the insured.[2]

2. For cases dealing with the related situation, where the named insured vehicle is transferred and subsequently involved in an accident and the insurance was held not assignable, see *Allstate Ins. Co. v. Smith,* 442 F.Supp. 89 (E.D.Okl.1977); *Semple v. State Farm Mutual*

We must acknowledge that our analysis of the current insurance policy differs in one major respect from that of the other jurisdictions. The policy here cannot simply be interpreted as providing liability insurance dependent upon the vehicle and personal injury coverage based on the individual. All three coverages as listed in Parts A., B. and C. may in one set of circumstances be dependent upon the motor vehicle while under different circumstances the same coverage is in effect dependent upon the person. Nonetheless, the distinction between personal and vehicle related insurance is applicable here. Point 1. of part B., of the policy provides coverage to: "You [the insured] ... while occupying ... a motor vehicle." The clear inference to be drawn is that this coverage pertains to *any* motor vehicle as distinguished from "your covered auto" contained in point 2. of Part B. Accordingly, the coverage is personal and not dependent upon the ownership of the vehicle.

A final point we must address is the policy's definition of "your covered auto", which Royal Indemnity contends precludes recovery. "Your covered auto" is defined as:

(a) Any vehicle shown in the Declarations.

(b) Any of the following types of vehicles of which you acquire ownership during the policy period, <u>provided that you ask us to insure it within thirty days after you become the owner</u>:

(1) a private passenger auto.

(2) if not used in any business or occupation, a pick-up, sedan delivery or panel truck.

If the vehicle replaces one shown in the Declarations, you have to ask us to insure it within thirty days only if you wish Damage to Your Auto Coverage to apply to the replacing vehicle.

(c) Any trailer you own.

(d) Any auto or trailer you do not own while used as a temporary substitute for any other vehicle described in this definition which is out of normal use because of its

*Automobile Insurance Co.,* 215 F.Supp. 645 (E.D.Pa.1963); and *McKinney v. State Farm Mut. Auto. Ins. Co.,* Ala. 349 So.2d 1091 (1977).

breakdown, repair, servicing, loss or destruction. (Underscoring supplied)

This definition, and in particular subsection (b) should be interpreted as applying to coverage involving "your covered auto". When applied to part B, medical payments coverage, "your covered auto" is not pertinent as the named insured is covered for injury arising from *any* motor vehicle.

In conclusion, under the circumstances of this case, Adams' transfer of the insured vehicle did not terminate the medical payment coverage as it pertains to him. This is of course, dependent upon the contract still being in effect even though the premiums had not been paid up to the date of the accident.

## II.

The assigned risk plan under which the Royal Indemnity policy issued is statutorily required. Section 105(a) of the No-Fault Act requires the insurance commissioner to establish such a plan to provide coverage for those who are otherwise unable to obtain insurance. Subsection (b) of section 105 provides:

(b) Cancellation, refusal to renew, or other termination of insurance.—Cancellation, refusal to renew and other termination of insurance shall be provided for in accordance with the provisions of the act of June 5, 1968 (P.L. 140, No. 78), entitled "An act regulating the writing, cancellation of or refusal to renew policies of automobile insurance; and imposing powers and duties on the Insurance Commissioner therefor." [3]

1974 July 19, P.L. 489, No. 176, Art. 1, § 105, effective in 12 months.

(Hereafter we shall refer to the Act of June 5, 1968 as the Act of 1968.)

Accordingly at first glance it would appear that assigned risk policies may only be cancelled in accordance with the Act of 1968.

---

**3.** Footnote in the original, Section 1008.1 et seq. of title 40 P.S.

Section 1008.5 of the Act of 1968 [4] reads:

Cancellation, refusal to renew, notice.

No cancellation or refusal to renew by an insurer of a policy of automobile insurance shall be effective unless the insurer shall deliver or mail, to the named insured at the address shown in the policy a written notice of the cancellation or refusal to renew. Such notice shall:

(1) Be approved as to form by the Insurance Commissioner prior to use;

(2) State the date, not less than thirty days after the date of such mailing or delivering on which such cancellation or refusal to renew shall become effective, except that such effective date may be fifteen days from the date of mailing or delivery when it is being cancelled or not renewed for the reason [of nonpayment of premium.] (Footnotes omitted)

However, Section 1008.1 of the Act of 1968 [5] excludes assigned risk policies from its provision:

As used in this act the following definitions shall apply: (1) "Policy of automobile insurance" or "policy" means a policy delivered or issued for delivery in this Commonwealth insuring a natural person as named insured or one or more related individuals resident of the same household, and under which the insured vehicles therein designated are of the following types only: (i) a motor vehicle of the private passenger or station wagon type that is not used as a public or livery conveyance for passengers and is not rented to others; or (ii) any other four-wheel motor vehicle with a gross weight not exceeding nine thousand pounds which is not principally used in the occupation, profession or business of the insured other than the farming: Provided, however, That this act shall not apply to any policy issued under an automobile assigned risk plan, nor to any policy insuring more than four automo-

---

4. This section was amended October 5, 1978, P.L. 1060, No. 248 § 1, to be effective in 90 days. The amendment was not in force at the date in question in this appeal.

5. See footnote 4.

biles, not to any policy covering garage, automobile sales agency repair shop, service station or public parking place operation hazards. (Underscoring supplied).

It therefore *appears* that the various sections of the No-Fault Act and the Act of 1968 are clearly inconsistent. Section 105(a) of the No-Fault Action establishes the assigned risk plan; subsection (b) provides that the procedure for cancellation be in accordance with the Act of 1968. The act of 1968 provides for cancellation for the nonpayment of premiums § 5, but not for such in assigned risk policies, § 1. However, we find that there is no inconsistency, but just poor organization by the draftsman.

When interpreting statutes, they should be interpreted as being in harmony with each other and construed as a component of the whole statutory structure. *Com. Dept. of Public Welfare v. Woolf,* 276 Pa.Superior Ct. 433, 419 A.2d 535 (1980). When laws pertain to the same subject matter, they should be construed, where possible, as one. *Girard School District v. Pittenger,* 481 Pa. 91, 392 A.2d 261 (1978); see 1 Pa.C.S. § 1932. In determining the intent of the general assembly, we must consider similar legislation, the object to be attained and the result of a given interpretation. *Com. Depart. of Transportation v. Von Altimus,* 49 Pa. Commonwealth Ct. 245, 410 A.2d 1303 (1980).

To read § 1009.105(b) as applying only to assigned risk situations would at first blush appear to negate the existence of the Act of 1968 as it does not apply to assigned risks. The legislature could not have intended to enact a nullity. Instead we find that No-Fault § 1009.105(b) is independent of 1009.105(a) and is a general provision regarding the cancellation of No-Fault policies. Subsection (b) should not be read in conjunction with 1009.105(a). The end result of this analysis is that the insurer of an assigned risk policy need not abide by the fifteen day notice requirement contained in § 1008.5. This was the intent of the legislature as demonstrated by its revision of such section

subsequent to the passage of the No-Fault Act, retaining the exclusion of the assigned risk policies. Therefore, as the statute lacks directive, we must review the contrast at hand to determine the cancellation procedure it required.

■ The Royal Indemnity policy contained the following provisions:

6. TERMINATION

A. Cancellation. This policy may be cancelled during the policy period as follows:

1. The named insured shown in the Declarations may cancel by returning this policy to us or by giving us advance written notice of the date cancellation is to take effect.

2. We may cancel by mailing to the named insured shown in the Declarations at the address shown in this policy.

(a) at least 10 days notice

(1) if cancellation is for nonpayment of premium; or

(2) if notice is mailed during the first 60 days this policy is in effect and this is not a renewal or continuation policy;

(b) at least 20 days notice in all other cases.

3. After this policy is in effect for 60 days and this is not a renewal or continuation policy, we will cancel only:

(a) for nonpayment of premium; or

(b) if your driver's license or that of any other driver who lives with you or customarily uses your covered auto has been suspended or revoked during the policy period; or if the policy period is other than one year, since the last anniversary of the original effective date.

The above provision is clear; Royal Indemnity had the right to cancel the Adams' policy after Adams missed the payment due July 9, 1977. However, such right was expressly conditioned on first notifying the insured at least ten days prior to the cancellation for nonpayment of premium. This Royal Indemnity did not undertake to do until the day after

the accident, at which time it was too late to relieve itself of its contractual liabilities for the accident of September 26, 1977. The Pennsylvania Automobile Insurance Plan, which was established pursuant to § 105 of the No-Fault Act, and of which a copy has been placed in the record, permits a carrier to cancel an assigned risk policy by giving notice as required in the policy. Sec. 18 B. But Royal Indemnity failed to give timely the notice required by the contract. Under the well established law of Pennsylvania, when notice of cancellation is required by statute or the policy, an insurer's failure to follow such requirement results in the continuation of coverage. *Paul v. Dwyer*, 410 Pa. 229, 188 A.2d 753 (1963); *Levan v. Pottstown, P. Ry. Co.*, 279 Pa. 381, 124 A. 89 (1924); *Scheel v. German American I. Co.*, 228 Pa. 44, 76 A. 507 (1910).

As the insured's transfer of the named insured car did not terminate in the context of this case Royal Indemnity's contractual obligations and Royal Indemnity failed to cancel the policy in accordance with its policy, we must vacate the judgment of the lower court since the Royal Indemnity policy was in effect on September 26, 1977.

Judgment vacated and case is remanded for further proceedings not inconsistent with this Opinion.[6]

HESTER, J., files a dissenting statement.

HESTER, Judge, dissenting:

I respectfully dissent. The motor vehicle covered by the Royal Policy was sold by the owner, Adams, in August, 1977. He did not advise Royal of the sale. The premiums on the Royal policy covering the Gross vehicle were in default as of July 9, 1977. Adams was injured on September 26, 1977, while riding as a passenger in a motor vehicle operated by one Peter Hellinger. In view of these undisputed facts, I would hold that the Royal No-Fault Policy did not remain in effect after the listed insured vehicle was no

6. The issue of Aetna's obligations versus Royal Indemnity's obligations were not raised before this court and therefore we do not address them.

longer owned by the named insured Adams, particularly in view of the fact that Adams had failed to make the premium payments. In retrospect, there was no need for Adams to pay the premium due September 9, 1977, he no longer owned the vehicle covered by the policy, he was not an insured under the Royal policy.

I would affirm on the Opinion of Judge Mueller of the court below. He concluded that:

"Once one no longer owns the automobile or uses it, one no longer has an insurable interest in the car, and the insurer is not obligated to make payments under the policy."