573 A.2d 1139

Michael LUKO and Independent Pier Company

v.

LLOYD'S LONDON and The Institute of London
Underwriters and Pennsylvania Insurance
Guaranty Association.

Appeal of LLOYD'S LONDON and The Institute of London
Underwriters, Appellant.

Michael LUKO and Independent Pier Company

v.

LLOYD'S LONDON and The Institute of London
Underwriters and Pennsylvania Insurance
Guaranty Association.

Appeal of PENNSYLVANIA INSURANCE GUARANTY
ASSOCIATION, Appellant.

Superior Court of Pennsylvania.

Argued Dec. 12, 1989.

Filed May 1, 1990.

A. Robert Degen, Philadelphia, for appellant (at 1470) and appellee (at 1471).

Lise Luborsky, Philadelphia, for appellant (at 1471) and appellee (at 1470).

Charles F. Love, Philadelphia, for Lupko, appellee (at 1470 and 1471).

Frank C. Bender, Philadelphia, for Independent Pier, appellee (at 1470 and 1471).

Before BROSKY, WIEAND and JOHNSON, JJ.

JOHNSON, Judge:

In this declaratory judgment action appeal is taken from an order granting summary judgment to appellees Independent Pier Company and Michael Luko. We are asked to decide whether coverage provided by the Pennsylvania Insurance Guaranty Association Act (the PIGA Act), 40 P.S. § 1701.101 *et seq.* can be substituted as underlying insurance for the benefit of an *excess insurer* when the underlying insurer becomes insolvent and where the excess policy contains an unambiguous clause providing for excess coverage to begin at a substantially lower amount should there be no underlying insurance. Because we determine

that the PIGA Act was not intended to be used in this way, we affirm.

Luko was employed as a longshoreman with Independent Pier Company. He was seriously injured on March 8, 1981 when he fell through a defective dock on the premises of Independent Terminal Company. On March 2, 1983, Luko brought an action against Independent Terminal Company for his injuries. During the relevant period, Independent Terminal and Independent Pier were each named insureds under a policy issued by Midland Insurance Company with limits of liability of $1,000,000.00 for each occurrence and $1,000,000.00 in the aggregate.

During that same period, Independent Terminal and Independent Pier were also insured by a consortium composed of Lloyd's London and additional members of The Institute of London Underwriters (the Consortium) under an umbrella policy with limits of liability of $10,000,000.00 for any one occurrence or, in the alternative, the excess of $100,000.00 for any one occurrence where no underlying insurance existed. Thus, Independent Terminal and Independent Pier were completely covered for claims up to $10,000,000.00, with Midland covering the first $1,000,000.00 and the Consortium covering the excess up to $10,000,000.00.

On April 30, 1986 Midland was declared insolvent by order of the Supreme Court of New York. Addressing just such circumstances where an insurer becomes insolvent and thus exposes its policyholders to financial loss, The Pennsylvania legislature enacted the Pennsylvania Insurance Guaranty Association Act (the PIGA Act), 40 P.S. § 1701.102; *Bethea v. Forbes*, 519 Pa. 422, 548 A.2d 1215 (1988). As a condition to doing business in Pennsylvania, each insurer is required to participate in the Association (PIGA). The Act mandates that PIGA shall:

> be obligated to make payment to the extent of the covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency ... but such obligation shall include only that amount of each covered

claim which is in excess of one hundred dollars ($100), and is less than three hundred thousand dollars ($300,000). 40 P.S. § 1701.201(b)(1)(i).   A covered claim:

means an unpaid claim ... which arises under a property and casualty insurance policy of an insolvent insurer....

40 P.S. § 1701.103(5)(a).

Following Midland's insolvency and its submission to liquidation proceedings, Independent Pier sought protection from PIGA with regard to Luko's claim.   In response to Independent Pier's request for reimbursement to the extent of Midland's liability, PIGA required that Independent Pier first seek coverage from the Consortium on the basis that the policy with the Consortium was insurance other than the policy of the insolvent insurer under the non-duplication provision of the Act:

Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy.   Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.

40 P.S. § 1701.503(a).   When the Consortium failed to respond to Independent Pier's request for information on the extent of its policy coverage, Independent Pier on March 23, 1988 commenced the declaratory judgment action now before us.   The complaint asked the court to determine the coverage for which each insurance entity was responsible. Michael Luko was added as a plaintiff by stipulation of counsel, thus bringing all necessary and indispensable parties into the action.

In answer, the Consortium asked the court to declare that they are to provide no coverage for the first $1,000,000.00 of liability because their contract with the insureds was based upon the existence of underlying coverage.   PIGA answered the declaratory judgment complaint by denying any obligation to provide coverage because of an alleged exclusion in the Midland policy excepting coverage of injury

sustained by an employee in the course of his employment. If it were obligated to provide coverage under the Midland policy, PIGA asserted that its obligation is limited to the amount of the claim exceeding the Midland policy deductible of $25,000.00, and less than $100,000.00, and that, in any event, the insured is required first to exhaust its rights under the excess policy with the Consortium. The defendants filed a petition for removal to the U.S. District Court on April 28, 1988, which was denied on August 29, 1988, and the case was remanded to the Court of Common Pleas.

On October 14, 1988 Independent Pier and Michael Luko filed a motion for summary judgment. The motion stated that the terms of the insurance contract with the Consortium provided coverage for any loss in excess of $100,000.00 if there was no underlying insurance. With respect to PIGA's obligation, the motion asserted that 40 P.S. § 1701.101 *et seq.* required PIGA to supply the coverage that the insolvent underlying insurer was contractually obligated to provide. They asserted that PIGA's obligation was any amount over the deductible of $25,000.00 and up to $100,000.00, the point at which the excess insurance coverage began.

The trial court granted the motion for summary judgment by issuing the following declaratory judgment order:

IT IS HEREBY ORDERED and DECREED that judgment is entered in favor of Plaintiffs, Michael Luko and Independent Pier Company, and against the Defendants as follows:

(a) Defendants, Lloyd's of London (*sic*) and the Institute of London Underwriters, are obligated to provide coverage to the Plaintiff, Independent Pier Company, with respect to the claim of Michael Luko for any and all amounts in excess of $100,000.00 and to defend the action commenced on behalf of Michael Luko to the extent required under the policies issued by them;

(b) Defendant, Pennsylvania Insurance Guaranty Association, is obligated to provide coverage to the Plaintiff, Independent Pier Company, in accordance with the provi-

sions of the Pennsylvania Insurance Guaranty Association Act, 40 P.S. Section 1701.101 et seq. for any and all amounts between $25,100.00 to $100,000.00.

Order of April 12, 1989. Both defendants appeal. At 1470 Philadelphia 1989, the Consortium challenges the court's conclusion that a clause in the contract requires it to "drop down" and provide some of what was primary coverage under the Midland policy when Midland became insolvent. At 1471 Philadelphia 1989, PIGA argues that an exclusion in the original Midland policy would have precluded Luko's claim entirely and that thus PIGA would not be required to supply coverage.

■ The Consortium mounts a two-part challenge to the trial court's decision. First, it argues that the trial court erred in deciding that its contract with the insureds provides that if no underlying insurance existed, then the Consortium's liability would drop down to begin at $100,000.00. The Consortium does not dispute that this first issue is purely one of contract interpretation. The Supreme Court of Pennsylvania has set forth the principles governing insurance contract interpretation:

> The task of interpreting a contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 304–305, 469 A.2d 563, 566 (1983) (citations omitted), *quoted in State Farm Mutual Automobile Insurance Co. v. Moore*, 375 Pa.Super. 470, 475, 544 A.2d 1017, 1019 (1988); *appeal denied* in *State Farm Mutual Automobile Insurance Co. v. Ohio Casualty Insurance Co.*, 521 Pa. 622, 557 A.2d 725 (1989). An insurance contract must be construed as a whole, and not in

discrete units. *Koval v. Liberty Mutual Insurance Company*, 366 Pa.Super. 415, 531 A.2d 487 (1987); *appeal denied* 518 Pa. 619, 541 A.2d 746.

■ We have reviewed the contract of insurance, the briefs and the trial court opinion and conclude that the contract language is unambiguous. The Consortium contracted to provide coverage beginning at $100,000.00 if there is no underlying insurance. The policy contains a typewritten declaration portion, which lists the names of the insured entities and specific modifications to the general, printed contract to which it is attached. The limits of liability are set forth as follows:

U.S. $10,000,000 any one occurrence.

U.S. $10,000,000 annual aggregate—Products.

U.S. $10,000,000 annual aggregate Occupational Disease.

ONLY TO PAY THE EXCESS OF:

(A) The Limits of Underlying Insurances as per Schedule attached. or

(B) U.S. $100,000 any one occurrence where no Underlying Insurance.

The general contract provision section is in standard print. The standard form declaration page contains no specifics. Rather, the words "as attached" appear after each item. The following is set forth in the general limits of liability section:

(a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances, or

(b) ["AS ATTACHED" is stamped here] ultimate net loss in respect of each occurrence not covered my said underlying insurances . . . . .

The trial court found that the presence of the two "(b)" clauses created an ambiguity and thus construed the contract in favor of the insured. We conclude that that the typewritten policy provisions supplant the general printed provisions. Hence, the contract provides for coverage beginning at $100,000 should no underlying insurance exist.

■  Second, the Consortium maintains that, if it is found that the insolvency of the primary insurer does activate coverage, causing its liability to "drop down," then, by virtue of the existence of PIGA, its liability should begin at $300,000.00, the upper limit of PIGA's statutory obligation, and not, as the court ordered, at $100,000.00. In response, PIGA asserts that it cannot be used as the Consortium's underlying insurer. We agree that the guaranty created by the PIGA Act cannot function as "other valid and collectible insurance" within the meaning of the Consortium's policies. We have decided that the Consortium's liability begins at $100,000.00. PIGA's liability is triggered only when the conditions of the PIGA Act are met:

> The Act itself explicitly declares that the Association does not stand in the stead of the insolvent insurer until:
>
> 1. The claim in question is determined to be a "covered claim." (40 P.S. § 1701.201, as that term is defined by 40 § 1701.103(5)).
>
> 2. The extent of the obligation of the Association on the covered claim is determined. (40 P.S. § 1701.201).
>
> 3. The claimant has exhausted his rights against his insurer under any provision in an insurance policy he maintains. (40 P.S. § 1701.503(a)).

*Henninger v. Riley*, 317 Pa.Super. 570, 575, 464 A.2d 469, 472 (1983).

Recently, this Court has interpreted the Act's exhaustion provision in the context of uninsured motorist coverage, an interpretation that illustrates the proper application of the exhaustion provision. In *Blackwell v. Pennsylvania Insurance Guaranty Association*, 390 Pa.Super. 31, 567 A.2d 1103 (1989), the insolvency of the tortfeasors' insurer recast them as uninsured motorists, and thus the plaintiff received uninsured motorist coverage from her own insurer. Because this did not cover the amount she sustained in damages, she sought to collect the entire amount of damages from PIGA. Holding that the plain meaning of the statute reduces recovery from PIGA by any amount received by other insurance coverage, we upheld a declaratory judg-

ment that PIGA was not obligated to pay the amount already covered by the plaintiff's own uninsured motorist provision. 40 P.S. § 1701.503(a).

In the present case, the Consortium asks that we regard PIGA protection as "other insurance" as defined in its policy. They advocate that PIGA should become the underlying insurer, at least up to its statutory limit of $300,-000.00, at which point the Consortium would then assume its excess coverage obligation. To allow this would be to pervert the legislative intent to protect individuals whose insurance companies have become insolvent, and we refuse to so interpret the statute. "The statutory purpose is to place *claimants* in the same position that they would have been in if the liability insurer had not become insolvent ..." *Blackwell*, 390 Pa.Super. at 37, 567 A.2d at 1106 (emphasis added). The intent of the Act is not to protect other insurers by filling in for every aspect of the underlying insurance but rather to fill in only as the insolvency adversely impacts upon the insured. To illustrate, a section of the Act specifically prohibits insurers from using the category "covered claim" to mean amounts allegedly due them from other insurers:

A covered claim shall not include any amount due any insurer, reinsurer, insurance pool, or underwriting association, as a subrogation recovery or otherwise.

40 P.S. § 1701.103(5)(b). We conclude that the trial court correctly applied PIGA in its order.

■ PIGA's main contention is that Independent Pier would not have been entitled to recover under the Midland policy, and that thus the claim is not a covered claim as defined in section 1701.103(5)(a) of the Act. PIGA asserts that, under the terms of the insurance contract, employees are excluded from coverage. After reviewing the contract of insurance as drawn up and agreed upon between the parties, we conclude that employees are, in fact, covered under the policy. We agree with the trial court's conclusion that this is a matter of contract interpretation, and we

concur in the court's disposition that the Midland policy does in fact cover employee Luko's claim.

■ Applying the above-set-forth contract interpretation principles to the contract at issue, we conclude that PIGA's position is unfounded. Independent Pier Company and Independent Terminal Company are each among the several named insureds named on an endorsement to the Midland policy. The policy contains the following clause in the Exclusions section of the standard printed contract:

EXCLUSIONS

This insurance does not apply:

. . . .

(j) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury

However, the policy is amended by a special endorsement, which by its express terms modifies the standard policy. The endorsement states:

It is agreed that the "persons insured" provision is amended to include any employee of the named insured while acting within the scope of his duties as such, ...

The endorsement, a specifically bargained-for contract provision, clearly and uambiguously modifies the standard employee exclusion. Where the language of the policy, including specific modification through amendments or endorsements is clear and unambiguous, it cannot be construed to mean other than what it says. *See United States Fidelity and Guaranty v. Griggs*, 341 Pa.Super. 286, 491 A.2d 267 (1985). The insurance contract at issue provides coverage to employees of the named insured.

■ Even if the above-quoted contract modification did not exist, a severability clause in the contract would act to provide coverage for damages arising out of Luko's injury. The definition section of the policy defines an insured as:

any person or organization qualifying as an insured in the "Persons insured" provision of the applicable insurance coverage. *The insurance afforded applies separately to each insured against whom claim is made or suit is brought,* except with respect to the limits of the company's liability.

(Emphasis supplied). Luko is an employee of Independent Pier Company, and under the standard (unmodified) contract, Independent Pier Company would not be insured for its employee Luko's injury. However, Independent Terminal Company is another named insured, in addition to several other named entities. Luko is not an employee of Independent Terminal Company. Therefore, the above "severability" clause provides for coverage of Luko's injury with respect to Independent Terminal Company, the entity against whom Luko seeks to collect damages.

PIGA's reliance upon *Pennsylvania Manufacturers' Association Insurance Co. v. Aetna Casualty & Surety Insurance Co.,* 426 Pa. 453, 233 A.2d 548 (1967) is misplaced. In that case, the court interpreted a standard automobile liability policy and concluded that the clear and unambiguous policy language excluded employees of the insured. This holding has no application to a case where, as here, the clear language of the policy does provide coverage for employees.

Finding no merit in the issues presented, we affirm the declaratory judgment order.

Order affirmed.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting.

I respectfully dissent from the reasoning and decision of my colleagues of the majority. In my opinion, the policy of umbrella coverage did not "drop down" when the underlying insurance carrier became insolvent. Even if it were to "drop down," however, it would not "drop down" below three hundred thousand ($300,000.00) dollars for which

there clearly was underlying coverage by the Pennsylvania Insurance Guaranty Association.

Michael Luko, a longshoreman employed by Independent Pier Company, was injured on March 8, 1981, while working on a pier owned by Independent Terminal Company. On March 2, 1983, Luko commenced an action against Independent Terminal Company to recover for the injuries which he had sustained.

At the time of the accident, Independent Pier Company and Independent Terminal Company were named insureds in a policy of comprehensive general liability insurance which had been issued by Midland Insurance Company. The policy contained a deductible or self-insured feature in the amount of twenty-five thousand ($25,000.00) dollars and had liability limits of one million ($1,000,000.00) dollars for each occurrence. Independent Pier Company and Independent Terminal Company were also protected by umbrella policies which had been issued by several underwriters at Lloyd's and the Institute of London Underwriters (hereinafter "Lloyds"). The limit of this coverage, which was expressly designated to be in excess of the coverage of one million dollars provided by Midland Insurance Company, was ten million ($10,000,000.00) dollars. The umbrella policies also contained provisions that for claims not covered by "underlying insurance," the underwriters would provide coverage for claims in excess of one hundred thousand ($100,000.00) dollars.

Approximately three and one-half years after Luko's action had been commenced, Midland Insurance Company was declared insolvent by the courts of New York. By that time, Independent Pier Company and Independent Terminal Company had merged into a corporation known as Independent Pier Company. When the corporation called upon the Pennsylvania Insurance Guaranty Association (P.I.G.A.) to undertake the obligations of its insolvent liability carrier, P.I.G.A. directed the insured to seek coverage from Lloyds, the writers of the excess coverage policies.

Faced with a dispute between P.I.G.A. and Lloyds regarding coverage, Independent Pier Company filed an action for declaratory judgment. Luko was added as a party plaintiff by stipulation as an essential party. The trial court, in response to motions for summary judgment, held that P.I.G.A. was responsible for coverage to the extent that Luko's claim and/or recovery did not exceed one hundred thousand ($100,000.00) dollars and that Lloyds was responsible for providing coverage for claims in excess thereof. Both P.I.G.A. and Lloyds appealed. The majority affirms. I would reverse.

Lloyds' coverage is determined by the terms of the policies which it issued. By these terms, Lloyds agreed to pay liabilities in excess of the underlying insurance of one million ($1,000,000.00) dollars which had been issued by Midland Insurance Company or the excess of $100,000.00 if there were no "underlying insurance." Where there was underlying insurance of one million dollars, Lloyds' liability was to pay for liability incurred in excess thereof. There is nowhere in the Lloyds' policy an agreement to insure against insolvency of the underlying insurance carrier. Midland Insurance Company was identified in the Lloyds' policy as the underlying insurance carrier, and Lloyds clearly agreed to pay only the excess of liability over that underwritten by Midland.

My review of the policies discloses that this intent is clear. There is no ambiguity. Lloyds' liability, according to the unambiguous terms of the policy, does not attach until the underlying insurance carrier or the insured has paid the amount of the underlying limit. Its policy provides for excess coverage, not primary coverage. Its coverage does not "drop down" merely because the underlying liability insurance carrier has become insolvent. See: *Werner Industries, Inc. v. First State Insurance Co.*, 112 N.J. 30, 548 A.2d 188 (1988); *Pergament Distributors, Inc. v. Old Republic Insurance Co.*, 128 A.D.2d 760, 513 N.Y.S.2d 467 (1987), *appeal denied*, 70 N.Y.2d 607, 519 N.Y.S.2d 1031, 514 N.E.2d 389 (1987); *Wurth v. Ideal Mutual Ins. Co.*, 34

Ohio App.3d 325, 518 N.E.2d 607 (1987). Contra: *Massachusetts Insurers Insolvency Fund v. Continental Casualty Co.*, 399 Mass. 598, 506 N.E.2d 118 (1987). The insolvency of the primary carrier does not alter the policy issued by the excess carrier so as to require the excess carrier to provide primary coverage. See: *Mission National Ins. Co. v. Duke Transp. Co., Inc.*, 792 F.2d 550 (5th Cir.1986).

Under the Pennsylvania Insurance Guaranty Association Act of Nov. 25, 1970, P.L. ——, No. 232, 40 P.S. §§ 1701.101 et seq., P.I.G.A. is required to stand in the shoes of an insolvent insurance carrier. Before it can be made to assume a liability of the insolvent carrier, however, it must first appear that the insolvent carrier provided coverage. In the instant case, P.I.G.A. argues that Midland did not provide coverage for the claim made by Luko because of the following exclusionary language in its policy:

This insurance does not apply:

. . . .

(j) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury ...

P.I.G.A. contends that Luko was an employee of the insured and that his claim, therefore, is excluded from the coverage provided by the Midland policy. However, the "insured" is defined by the policy as

any person or organization qualifying as an insured in the "Persons insured" provision of the applicable insurance coverage. *The insurance afforded applies separately to each insured against whom claim is made or suit is brought,* except with respect to the limits of the company's liability. (emphasis added).

Here, Luko was employed by Independent Pier Company, a named insured, but his claim was against Independent Terminal Company, which was not his employer. For purposes of determining the obligations of the insurance carrier with respect to such a claim, Independent Terminal

Company must be deemed "the insured." Luko was not employed by Independent Terminal Company; and, therefore, his claim must be deemed the claim of a third person. His employment by Independent Pier Company does not preclude coverage where, as here, his claim has been directed against Independent Terminal Company. See: *U.S. Fidelity and Guaranty Company v. Globe Indemnity Co.*, 60 Ill.2d 295, 327 N.E.2d 321 (1975). The severability of interests clause makes it abundantly clear that the use of the word "insured" in the exclusionary clause of the policy refers only to the person or entity for whom coverage is then in issue.

It is correct, as P.I.G.A. argues, that a contrary result was reached under slightly different circumstances in *Pennsylvania Manufacturers Association Insurance Co. v. Aetna Casualty & Surety Insurance Co.*, 426 Pa. 453, 233 A.2d 548 (1967). Recent decisions in other jurisdictions, however, have abandoned such a broad interpretation of the word "insured" and, in reliance upon the severability clause, have held that "the insured" means the person or entity against whom the claim has been made. See: *United States Fidelity and Guaranty Co. v. Globe Indemnity Co., supra; Commercial Standard Insurance Co. v. American General Insurance Co.*, 455 S.W.2d 714 (Tex.1970). Cf. *Patton v. Patton*, 413 Pa. 566, 198 A.2d 578 (1964). In the instant case, the intent, as evidenced by the severability clause, is clear.

Midland Insurance Company's policy of liability insurance provided coverage for Independent Terminal Co. in an amount not to exceed one million ($1,000,000.00) dollars. Because Midland became insolvent, P.I.G.A. must assume Midland's obligations. By statute, however, P.I.G.A.'s liability cannot exceed three hundred thousand ($300,000.00) dollars. See: 40 P.S. § 1701.201(b)(1)(i). Within this statutory limit it seems clear to me that P.I.G.A. is an underlying insurer and is required to provide coverage to Independent Terminal Co. Thus, even if Lloyds' excess coverage were to "drop down," it would be required to provide coverage

only for liability of Independent Terminal Co. in excess of three hundred thousand ($300,000.00) dollars. See: *Washington Insurance Guaranty Association v. Guaranty National Insurance Co.*, 685 F.Supp. 1160 (W.D.Wash.1988).

For these reasons, I respectfully dissent from the majority's decision to affirm the judgment entered in the trial court. I would hold that primary coverage, within the limits set by statute, must be provided by P.I.G.A. and that Lloyds' coverage is only for such liability as exceeds one million ($1,000,000.00) dollars. Only in this way can we give effect to the unambiguous terms of the liability policies purchased by the insured.