630 A.2d 28

ST. PAUL MERCURY INSURANCE COMPANY, Appellant,

v.

Scott J. CORBETT.

Superior Court of Pennsylvania.

Argued April 19, 1993.

Filed Aug. 13, 1993.

James C. Haggerty, Philadelphia, for appellant.

Richard L. Hughey, Media, for appellee.

Before CAVANAUGH, WIEAND, McEWEN, CIRILLO, DEL SOLE, BECK, TAMILIA, JOHNSON and HUDOCK, JJ.

CIRILLO, Judge:

This is an appeal from a judgment entered in the Court of Common Pleas of Delaware County denying appellant St. Paul Mercury Insurance Company's (St. Paul) post-trial motions and reaffirming its holding in favor of appellee Scott J. Corbett (Corbett). We reverse.

On June 21, 1985, Corbett, while in the course and scope of his employment, was involved in a motor vehicle accident in which he was the operator of a vehicle owned by his employer. The accident in question was a "hit and run" in which Corbett sustained severe personal injuries.

At the time of the accident, the employer's vehicle was insured by Liberty Mutual Insurance Company (Liberty Mutual) and provided $15,000.00 of uninsured/underinsured motorist coverage (UM/UIM coverage) per person in accordance with the provisions of the Pennsylvania Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa.C.S.A. § 1701 *et seq.* At the time of the accident, there also existed an insurance policy issued by Allstate Insurance Company (Allstate) to Corbett's mother, Jane Corbett, with whom he resided. The

Allstate policy provided $100,000.00 of UM/UIM coverage per person. There also existed a personal policy of insurance issued by CIGNA Insurance Company (CIGNA) to Diane Corbett, wife of Scott Corbett and a resident of the same household. This policy provided for $300,000.00 of UM/UIM coverage per person. Finally, Corbett himself had a special antique vehicle policy with St. Paul covering a 1952 Singer Roadster which provided for $50,000.00 of UM/UIM benefits.

Following the accident, Corbett made claims against all four of the above-mentioned policies for uninsured motorist (UM) benefits.[1] Pursuant to the MVFRL, Liberty Mutual paid Corbett $15,000.00 in UM benefits since the accident occurred while he was driving an employer-owned vehicle insured by Liberty Mutual. *See* 75 Pa.C.S.A. § 1733(a)(1). Thereafter, Corbett sought recovery of additional UM benefits from Allstate, CIGNA and St. Paul.

St. Paul filed a petition seeking declaratory relief claiming that UM benefits were not recoverable by Corbett because the antique automobile insurance policy provided coverage limited to injuries sustained while Corbett was operating the antique automobile. The Honorable Anthony R. Semeraro denied St. Paul's petition, finding Corbett was entitled to UM benefits under the antique policy. This timely appeal followed.

Appellant St. Paul presents one issue for our review:

(1) Whether the trial court erred in concluding that Corbett may maintain a claim for recovery of uninsured motorist

---

1. Similar to the Liberty Mutual, Allstate and CIGNA policies, page 4 of the Endorsement to the Antique Automobile Insurance Policy issued by St. Paul in effect at the time of the accident defines an "uninsured motor vehicle" as follows:
    a land motor vehicle or trailer of any type.
    1. To which no bodily injury liability bond or policy applies at the time of the accident.
    2. Which is a hit and run vehicle whose operator or owner cannot be identified and which hits or which causes an accident resulting in bodily injury without hitting:
    a. you or any family member;
    b. a vehicle which you or any family member are occupying; or
    c. your covered auto.
    (emphasis omitted).

benefits under the antique automobile policy issued by St. Paul?

(a) Whether the parties to the antique automobile policy reasonably expected coverage to extend to use of automobiles beyond the antique automobile and its limited uses?

(b) Whether the coverage limitations contained within the antique policy which allowed for a substantial reduction in premiums violated public policy?

[1] Initially, we note that our standard of review is narrow. *Palladino v. Dunn*, 361 Pa.Super. 99, 103, 521 A.2d 946, 948 (1987); *see also Supp v. Erie Insurance Exchange*, 330 Pa.Super. 542, 479 A.2d 1037 (1984). Since declaratory judgment actions follow the practice and procedure of actions in equity, we will review the determination of the trial court as we would a decree in equity and set aside the judgment of the trial judge only where it is not supported by adequate evidence. *Palladino*, 361 Pa.Super. at 103, 521 A.2d at 948; *see also Shepley v. Dobbin*, 351 Pa.Super. 182, 505 A.2d 327 (1986).

Absent a rejection of uninsured motorist benefits in the form of a written waiver signed by the insured, the MVFRL requires that every motor vehicle liability insurance policy issued in the Commonwealth include both uninsured and underinsured motorist coverage. *See* 75 Pa.C.S. § 1731.[2] *See also Johnson v. Pennsylvania National Insurance Compa-*

---

2. **§ 1731. Availability, scope and amount of coverage.**
   (a) **Mandatory offering.**—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverages). Purchase of uninsured and underinsured motorist coverages is optional.
   (b) **Uninsured motorist coverage.**—Uninsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of uninsured motor vehicles. The named insured shall be informed that he may reject uninsured motorist coverage by signing [a] written rejection form[.]
   75 Pa.C.S. § 1731.

*nies,* 527 Pa. 504, 594 A.2d 296 (1991); *Wolgemuth v. Harleysville Mutual Insurance Company,* 370 Pa.Super. 51, 535 A.2d 1145 (1988). St. Paul's Antique Automobile Insurance Policy provided the mandatory offering of UM coverage. That coverage, however, is limited in these circumstances as provided in the clear language of the policy.

After reviewing the parties' arguments, the insurance contract, the MVFRL and the applicable case law, we conclude that Corbett is not entitled to UM benefits under the Antique Automobile Policy. In our judgment, this conclusion is neither contrary to public policy nor in derogation of the right created by statute.

## I. INTENT AND REASONABLE EXPECTATIONS OF INSURED.

▇▇▇▇ This court has held that the proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured. *Dibble v. Security of America Life Ins. Co.,* 404 Pa.Super. 205, 210, 590 A.2d 352, 354 (1991). In determining the reasonable expectations of the insured, courts must examine the totality of the insurance transaction involved. *Id.; see also Curbee, Ltd. v. Rhubart,* 406 Pa.Super. 505, 509, 594 A.2d 733, 735 (1991) (an interpretation of an exclusion clause in an insurance policy must be based on the policy in its entirety); *Luko v. Lloyds of London,* 393 Pa.Super. 165, 171–172, 573 A.2d 1139, 1142 (1990) (insurance must be construed as a whole, and not in discrete units). However, while reasonable expectations of the insured are the focal points in interpreting the contract language of insurance policies, *see Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 388 A.2d 1346 (1978); *Winters v. Erie Insurance Group,* 367 Pa.Super. 253, 532 A.2d 885 (1987), an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous. *Neil v. Allstate Insurance Co.,* 379 Pa.Super. 299, 549 A.2d 1304 (1988). Like every other contract, the goal of interpreting an insurance contract is to ascertain the intent of the parties as manifested by the language of the policy. *Koenig v.*

*Progressive Insurance Co.,* 410 Pa.Super. 232, 236, 599 A.2d 690, 691–692 (1991).

■ The policy at issue is clear and unambiguous; it limits coverage to antique automobile activities. The Antique Auto Endorsement to the policy in effect at the time of the accident provides:

**What This Endorsement Does**

This endorsement helps define coverage under your Antique Auto Policy.

**The covered auto** must be used mainly for car club activities, exhibits, parades or a private collection. Occasional use of the automobile for other reasons is permitted. However, those reasons do not include the uses as listed below.

**Regular driving.** We won't cover loss or damage if the vehicle is driven for regular auto usage. Example of regular auto usage includes driving to and from work or school.

\*       \*       \*       \*       \*       \*

(emphasis in original). As indicated, this endorsement applies to all coverages provided by St. Paul. All policy benefits, therefore, *including UM benefits,* contemplate limited coverage consistent with the limited use of the antique automobile. Clearly, had Corbett engaged in "regular driving" of his antique automobile, on his way to or from work as he was during this hit and run accident, he would not, under the clear terms of the endorsement, be eligible for UM benefits. Can an insured under these circumstances then reasonably expect coverage when he is driving another motor vehicle and the covered automobile is safely garaged? Furthermore, Part C of the antique automobile policy, entitled "Uninsured Motorists Coverage," clearly restricts UM benefits in accordance with the endorsement:

We will pay damages which a **covered person** is legally entitled to recover from the owner or operator of either an **uninsured motor vehicle** or **underinsured motor vehicle,** but not both, because of bodily injury:

1. Sustained by a **covered person;** and

2. Caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle** or **underinsured motor vehicle.**

*    *    *    *    *    *

**"Covered person"** as used in this endorsement means:

1. You or any **family member**

2. Any other person **occupying your covered auto.**

3. Any person for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in 1. or 2. above.

*    *    *    *    *    *

(emphasis in original).[3] On page one of the Antique Automobile Policy, under the general heading **DEFINITIONS**, "Your Covered Auto" is defined as follows:

**"Your covered auto"** means:

1. Any **antique vehicle, classic vehicle** or **special interest vehicle** shown in the Declarations.

2. Any **antique vehicle, classic vehicle** or **special interest vehicle** of which you acquire ownership during the policy period provided that it replaces one shown in the Declarations and you ask us to insure it within thirty days after you become the owner. . . .

(emphasis in original).[4] Although the dissent would find that under the terms of the policy uninsured motorist coverage extends to the named insured even when not occupying the antique automobile, the policy, when read in its entirety, limits coverage to antique automobile activities. Thus, UM coverage is restricted to the insured, his family members, or any *other* person occupying the "covered auto," the antique vehicle. Paragraph one and paragraph two in the definition of covered person must be read together. In so doing, the phrase

---

**3.** An "uninsured motor vehicle," as applicable in this case, is defined in the MVFRL as "[a]n unidentified motor vehicle that causes an accident resulting in injury." 75 Pa.C.S. § 1702.

**4.** "Antique vehicle," "Classic vehicle," and "Special Interest vehicle" are further defined in this section of the policy.

"occupying your covered auto" clarifies both "you or any family member" and "any other person." Coverage under this policy is not independent of any connection with the "covered auto." *Cf. Royal Indemnity Company v. Adams,* 309 Pa.Super. 233, 241, 455 A.2d 135, 139 (1983) (distinguishing between personal and vehicle related insurance in the policy; "any motor vehicle" as distinguished from "your covered auto").

Clearly, a specialty or limited use policy such as the antique automobile policy before us must be distinguished from an ordinary policy covering a personal use automobile. The antique automobile insurance policy is not designed to provide UM benefits to a covered person in a hit and run accident unless the uninsured motor vehicle hits the antique auto. *Cf. Johnson v. Pennsylvania National Insurance,* 527 Pa. 504, 509–510, 594 A.2d 296, 299 (1991) ("[T]he **right** to the uninsured motorist benefits is provided by statute, but the **method of obtaining** those benefits is covered by the insurance policy.... Clearly, if there were a policy provision that was in derogation of the right provided by statute, we would deem the policy provision unenforceable.")

Corbett could not have reasonably expected coverage in the instant case. The antique policy limited coverage to the use of the Roadster. Corbett, in turn, limited the use of his Roadster. As a result, the premiums charged for the UM coverage under the antique policy were substantially lower than those charged under the regular or personal insurance policies. In fact, St. Paul charged only $6.00 for $50,000.00 in UM coverage for a period of one year. By contrast, the insurers of the personal or regular automobile insurance policies charged approximately $102.00 per year for $300,000.00 in UM coverage. This case illustrates the time worn maxim, "you get what you pay for." Keeping in mind the low cost of the premiums, in addition to the clear language of the policy and the material differences between an antique car policy and a personal use automobile policy, Corbett could not reasonably expect St. Paul to provide UM coverage under the circumstances presented here. *See Standard Venetian Blind v. American Empire Insurance Company,* 503 Pa. 300, 469 A.2d

563 (1983); *Koenig v. Progressive Insurance Company,* 410 Pa.Super. 232, 599 A.2d 690 (1991).

## II. PUBLIC POLICY.

█ The restricted UM coverage under the antique policy in this case is not contrary to public policy or the intent of the MVFRL. In fact, permitting coverage in this case would frustrate one of the intended goals of the MVFRL, to control spiraling insurance costs. *See Lambert v. McClure,* 407 Pa.Super. 257, 595 A.2d 629 (1991). In addition, this court has recently upheld various limitations on UM/UIM motorist coverage, mindful of the purposes of the MVFRL. *See, e.g., Marino v. General Accident Insurance,* 416 Pa.Super. 1, 610 A.2d 477 (1992) (a "use for hire" exclusion in an uninsured motorist endorsement is not violative of the MVFRL especially in light of the fact that the statute does not contain an exclusive list of permissible coverage exclusions); *Kelly v. Nationwide Insurance Company,* 414 Pa.Super. 6, 606 A.2d 470 (1992) (citing *Wolgemuth v. Harleysville Mutual Insurance Company,* 370 Pa.Super. 51, 535 A.2d 1145 (*en banc*), *alloc. denied,* 520 Pa. 590, 551 A.2d 216 (1988)) (a policy exclusion that prevents vehicles insured under the liability coverage of the policy from being considered as an underinsured vehicle is not contrary to public policy); *see also Adelman v. State Farm Mutual Insurance Company,* 255 Pa.Super. 116, 386 A.2d 535 (1978). Though the law provides for a mandatory offering of uninsured motorist coverage mandatory, a restriction in coverage in these circumstances does not necessarily undermine the MVFRL. *Cf. Wolgemuth, supra.*

Recognizably, in order to reduce the costs of insurance, the Legislature must have intended to maintain different classifications of insurance such as the antique auto policy in this case. The policy that Corbett purchased is a special insurance policy designed specifically for antique and collector automobiles. The very limited use of antique automobiles does not subject them to the normal exposure or danger from uninsured motorists. These vehicles are seldom driven on highways for fear of wear and tear or breakdown. In fact, owners

of antique automobiles often have their antique cars transported on flatbed trucks. Because of the decreased risks associated with antique vehicles, premiums for these special insurance policies are lower than those for personal automobile policies. To invalidate the restrictions found in the policy would force insurance companies to raise rates on antique automobile policies to account for the attendant increased risks. If coverage is permitted under the circumstances presented here, the distinctions between antique automobile insurance and other types of insurance will be eradicated and premiums for antique vehicle insurance will be on par with personal automobile insurance. This result was not contemplated by the Legislature in enacting the MVFRL. *See Wolgemuth, supra* (one purpose of the legislature in enacting the Motor Vehicle Financial Responsibility Law was to reduce the cost of purchasing motor vehicle insurance); *see also Marino, supra* (it was the legislature's intent when enacting the MVFRL to control rising insurance costs).

Finally, the fact that Pennsylvania provides for special registration plates and fees for antique automobiles and proscribes certain uses of such vehicles also illustrates the Legislature's intent to maintain distinct classifications of automobiles.[5] Different classifications of automobiles have different insurance needs. In this case, the antique policy issued to Corbett was not meant to compensate the insured or a covered person in an accident involving an uninsured motor vehicle unless that uninsured motor vehicle hits the antique car. Based on the foregoing, we do not find that this definition of

5. Specifically, section 1340(b) of the Motor Vehicle Code provides that "[i]t is unlawful for any person to operate a vehicle with antique or classic registration plates for general daily transportation. Permitted use shall be limited to participation in club activities, exhibits, tours, parades, occasional transportation and similar uses. Occasional transportation shall mean no more than one day per week." 75 Pa.C.S.A. § 1340(b).

   In addition, the annual registration fee of an antique or classic vehicle is $50.00 pursuant to section 1923 of the Motor Vehicle Code; in comparison, the annual registration fee for passenger cars is $24.00 pursuant to section 1912. 75 Pa.C.S.A. §§ 1923, 1912.

"uninsured motor vehicle" in the insurance agreement offends public policy. *Wolgemuth, supra.*

Construing the insurance policy as a whole, keeping in mind the reasonable expectations of the insured as well as the plain language of the policy exclusions, *Dibble, supra; Neil, supra,* we find that the contracted coverage limitations in the antique automobile insurance policy are valid and enforceable. We, therefore, reverse the trial court's decree denying St. Paul's petition for declaratory and injunctive relief. *Palladino, supra.*

Judgment reversed.

DEL SOLE, J., files a dissenting opinion, in which WIEAND, McEWEN and BECK, JJ., join.

DEL SOLE, Judge, dissenting.

While the Majority's analysis might be a correct interpretation of the Uninsured Motorists coverage language contained in the Antique Auto Policy as it was originally issued on January 14, 1982, it is the endorsement in effect on the date of the accident that controls. The Majority has failed to recognize that changes made in policy language in 1985, were significant and expressly altered those who would be "covered persons" under the antique automobile insurance policy. The 1985 endorsement does not contain the restricted language which was present in the original policy and it expressly provides coverage to Appellee as the named insured regardless of whether he was occupying the vehicle at the time of the accident. Because the express terms of the policy allow for coverage and because the Majority has failed to recognize this and has sought to interpret clear policy language by seeking to determine the intent of the parties, I dissent.

Appellee first acquired insurance for his antique automobile with St. Paul on January 14, 1982. The policy as originally issued provided uninsured motorist coverage under Part C. That section limited coverage to those who were occupying the antique automobile at the time of the accident by including the following definition of a "covered person."

"Covered person" as used in the part means:

1. Any person occupying your covered auto.

2. Any person for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in 1. above.

This provision continued to define the scope of the uninsured motorist coverage until January 14, 1985. At that time, following the passage of the Motor Vehicle Financial Responsibility Act, St. Paul issued a new endorsement, and increased the price of uninsured motorist coverage from $3.00 to $6.00. The new endorsement redefined the term "covered person" to read:

"Covered person" as used in this endorsement means:

1. You or any family member.

2. Any other person occupying your covered auto.

3. Any person for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in 1. or 2. above.

Appellee as the named insured qualifies as a "covered person" under paragraph one of the definition. The Majority, however, ignores the punctuation in the definition of "covered person" and concludes that "[p]aragraph one and paragraph two in the definition of covered person must be read together." Majority Opinion at 31. The Majority reasons that by so reading the paragraphs, uninsured motorist coverage is restricted, as it was when originally issued in 1983, to the insured, his family members or any other person who is occupying the antique automobile at the time of the accident.

The Majority fails to realize that St. Paul made express alterations in the terms of coverage and, instead of listing a single class of covered persons (those occupying the vehicle,) it now provided two distinct groups and listed them in paragraphs one and two. Such a change would not have been necessary if coverage was to have continued to apply as before. The groups of "covered persons" in the 1985 endorsement are identified in separate paragraphs, and each clause defining a group ends in a period, not a comma or the

conjunctive word "and." The inclusion of a "period" indicates that the clauses were not meant to be read together; rather, each clause is independent of the other. Coverage applies to the named insured and his family members under paragraph one. Paragraph two extends coverage to any person who was occupying the covered vehicle. Paragraph three evidences the distinct nature of these two groups where it states that a covered person includes those persons "described in 1. *or* 2. above." (emphasis added.) If the clauses were meant to be read together, as the Majority suggests, paragraph three would state that coverage applies to persons described in both 1. *and* 2. It does not.

The language contained in instant policy defining a "covered person" is found in many uninsured motorist policies issued throughout this Commonwealth. In cases involving policies with identical language, the clauses have never been read to modify each other as the Majority suggests. *See: Caldararo v. Keystone,* 393 Pa.Super. 103, 573 A.2d 1108 (1990); *Wolgemuth v. Harleysville Mutual Insurance Co.,* 370 Pa.Super. 51, 535 A.2d 1145 (1988); *Pirches v. General Accident Insurance Co.,* 354 Pa.Super. 303, 511 A.2d 1349 (1986.)

Because the restricted language of the original 1982 policy was changed in 1985 and, in clear terms, lists distinct classes of persons who are covered, and because these definitions have never been read together as modifying each other to create one identifiable group, I believe the Majority has erred in its reading of the policy language.

The Majority compounds this error by going outside the plain language of the policy in an effort to examine what Appellee could "have reasonably expected" his coverage to be. Majority Opinion at 9. It is elementary that when interpreting a contract which is clear and unambiguous, it must be construed only as written, and a court may not modify the plain meaning of the words under the guise of interpretation. *Trumpp v. Trumpp,* 351 Pa.Super. 205, 505 A.2d 601 (1985). The fact that the parties do not agree upon a proper interpretation does not necessarily render the contract ambiguous. *Vogel v. Berkley,* 354 Pa.Super. 291, 511 A.2d 878 (1986).

Because the express terms of the policy clearly afford Appellee relief, I believe the Majority's discussion regarding the parties expectations is misplaced. Further, I would point out that the facts of the case do not support the Majority's conclusion that Appellee could not have expected coverage in this case. The Majority bases its conclusion on the fact that premium charged for uninsured motorist benefits under the antique policy was much less than that charged for coverage on Appellee's family auto policies. The Majority reasons that the antique policy was less expensive because it contemplated covering limited instances where the insured or a family member were traveling in the antique automobile. I disagree.

In seeking to identify the parties expectations the Majority has failed to consider the fact, as demonstrated by the record, that when St. Paul issued the expanded endorsement for uninsured motorist coverage in 1985, it doubled the uninsured motorist premium. Prior to 1985, the premium for uninsured motorist coverage under the antique automobile policy was $3.00. Following the renewal in 1985 with the expanded coverage, it rose to $6.00. Clearly, St. Paul anticipated a greater exposure from the new endorsement, and for that reason, it doubled the cost of uninsured motorist coverage for Appellee's antique automobile.

The Majority's forced interpretation of the policy's clear and unambiguous definition of a "covered person" and its gratuitous assumption, without support in the record, of the Appellee's economic expectation, cause me to strongly dissent from its ruling.

WIEAND, McEWEN and BECK, JJ., join.