656 A.2d 142

## GAMBLE FARM INN, INC.

v.

**SELECTIVE INSURANCE COMPANY, Larry Coploff, Mary Coploff, Ronald Drewery, Debra Drewery, Louis Winner, Rose Winner, Scott Hayes, Mrs. Maile Marshall, Tami Hershey and Michelle Zellers.**

### Appeal of SELECTIVE INSURANCE COMPANY.

Superior Court of Pennsylvania.

Argued Oct. 20, 1994.

Decided Feb. 14, 1995.

Reargument and Reconsideration Denied April 21, 1995.

---

502

Mitchell S. Pinsly, Philadelphia, for appellant.

Kristine L. Waltz, Williamsport, for Gamble Farm Inn, appellee.

Before BECK, HUDOCK and BROSKY, JJ.

BECK, Judge:

The issue is whether the "pollution exclusion" in a commercial Comprehensive General Liability insurance policy applies to deny coverage for damages arising out of the release of carbon monoxide within a restaurant when the restaurant's hot water heater malfunctioned. We hold that the pollution exclusion does not apply to the facts of this case, and therefore affirm the trial court's entry of summary judgment in favor of the insured restaurant.

The relevant facts are not in dispute. Appellant Selective Insurance Company issued a Comprehensive General Liability ("CGL") insurance policy to appellee Gamble Farm Inn, Inc., which operates a restaurant. The insurance policy provides coverage during the relevant time period for all "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' " caused by an "occurrence." An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

During the policy's effective period, animals (probably squirrels) deposited nuts into the flue of a hot water heater located on appellee's premises. As a result, the flue became clogged, the heater shut down, and certain gases or fumes were created. The fumes seeped through the floor between the basement and the dining area of the restaurant, and several patrons became ill and sought medical attention. Patrons have made claims against appellee for payment or reimbursement of medical expenses; to date, appellee has paid approximately $2,000.00 as a result of these claims. Additionally, some restaurant patrons have filed civil actions against appellee.

Just days after the incident, appellee submitted a general liability loss notice to appellant for coverage of the incident. Appellant denied coverage on the basis of the policy's "pollution exclusion." The exclusion provides:

The Company shall have no obligation under this policy (1) to investigate, settle or defend any claim or suit against

any insured alleging actual or threatened injury or damage of any nature or kind to persons or property which arises out of or would not have occurred but for the **pollution hazard**; or (2) to pay any damages, judgments, settlements, losses, costs or expenses of any kind or nature that may be awarded or incurred by reason of such claim or suit or any such actual or threatened injury or damage; or (3) for any losses, costs or expenses arising out of any obligation, order, direction or request of or upon any insured, including but not limited to any governmental obligation, order, direction or request, *to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize irritants, contaminants or pollutants.*

"**Pollution hazard**" means an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties of any solid, liquid, gaseous or thermal pollutants, contaminants, irritants or toxic substances, including smoke, vapors, soot, fumes, acids or alkalis, and waste materials consisting of or containing any of the foregoing arising out of the discharge, dispersal or release or escape of any of the aforementioned irritants, contaminants or pollutants *into or upon land, the atmosphere or any water course or body of water.* Waste material includes any materials which are intended to be or have been recycled, reconditioned or reclaimed.

(emphasis supplied).

In its motion for summary judgment and its brief to this court, appellant argued that the pollution exclusion is "absolute" and unambiguous, and that the policy therefore cannot reasonably be interpreted to apply to the restaurant incident. Appellee asserts that the exclusion is ambiguous under the unique circumstances of this case, and that the policy should be construed in favor of the insured, to provide coverage. The trial court agreed with appellee, and granted its cross-motion for summary judgment.

■ Our review of the summary judgment decision is plenary. *Briggs v. Erie Ins. Grp.*, 406 Pa.Super. 560, 594 A.2d 761

(1991). Judgment may be entered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Pa.R.Civ.P. 1035(b).

 Generally, the interpretation of insurance contracts is a question of law that properly may be decided by the court rather than a jury. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983) (citing *Gonzalez v. United States Steel Corp.*, 484 Pa. 277, 398 A.2d 1378 (1979)). Where a provision of a policy is ambiguous, the policy is to be construed in favor of the insured, who typically lacks bargaining leverage regarding the terms of the coverage, and against the insurer, the drafter of the agreement. *Id.* at 304–06, 469 A.2d at 566; *Rusiski v. Pribonic*, 511 Pa. 383, 515 A.2d 507 (1986). Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. *Standard Venetian Blind, supra; Rusiski, supra.*

The threshold determination of whether a writing is clear and unambiguous necessarily lies with the court. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986). A contract is "ambiguous" where "it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* at 201, 519 A.2d at 390. Ambiguous terms are subject to "more than one interpretation when applied to a particular set of facts." *DiFabio v. Centaur Ins. Co.*, 366 Pa.Super. 590, 531 A.2d 1141, 1143 (1987); *Techalloy Co. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 487 A.2d 820, 823 (1984).

 We examine the insurance contract to determine whether the language is ambiguous.[1] *Standard Venetian*

1. The trial court did not make a specific finding that the terms were ambiguous. Instead, it based its decision on the "reasonable expectations" of the insured. We need not address this precise question as we hold that the policy is ambiguous and the ambiguity of the policy terms authorizes construction in favor of the insured, regardless of the insured's reasonable expectations. We note that the "reasonable expecta-

*Blind, supra,* instructs the court to examine the language of the policy itself. We conclude the policy language is ambiguous. The policy excludes coverage where the pollutant is discharged "into or upon land, the *atmosphere* or any water course or body of water" (emphasis supplied). The ambiguity in the policy arises from the meaning of the word "atmosphere."

Specifically, there is more than one reasonable definition of the term "atmosphere." If we define the term in its broadest, most all-encompassing sense, surely the air within the restaurant would be included, and appellant properly could deny coverage. Of course, several equally reasonable definitions can be found in the dictionary:

> 1. The mass or body of gases that surrounds the earth or any heavenly body. 2. The particular climatic condition of any place or region regarded as dependent on the air. 3. Any surrounding or pervasive element of influence: an atmosphere of gloom. 4. The prevailing tone of a poem, novel, painting, etc. 5. *Colloq.* An indefinable aura regarded as especially characteristic: This cafe has atmosphere. 6. *Physics.* A conventional unit of pressure....

Funk & Wagnalls, *New Comprehensive International Dictionary of the English Language* (1982). *Webster's New World Dictionary of the American Language* (1966) includes "the air in any given place" within its definition of "atmosphere."

tions" analysis for the interpretation of insurance policies does not command a majority of our supreme court. *See Gene & Harvey Builders, Inc. v. Penna. Manufacturers' Ass'n,* 512 Pa. 420, 517 A.2d 910, 913 n. 1 (1986) (citing *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563 (1983) (Hutchinson, J., concurring). *See also Grinnell Mutual Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495 (Minn.App.1988) (reasonable expectations of insured were that damage caused by deteriorating foam insulation inside home would be covered by insurance policy), *overruled by Board of Regents of the University of Minnesota v. Royal Ins. Co.,* 517 N.W.2d 888 (Minn. 1994) (reasonable expectations analysis is unnecessary; ambiguous terms of pollution exclusion authorize construction in favor of insured). In addition, we point out that an appellate court may affirm the trial court on a legal theory different from that relied on by the trial court. *See Strickler v. Huffine,* 421 Pa.Super. 463, 618 A.2d 430 (1992); *In re Benson,* 419 Pa.Super. 582, 615 A.2d 792 (1992).

The parties have not referred us to any binding decision which defines the term "atmosphere" as used in insurance policies, nor have we found any such cases through our own research.[2] We may be guided, however, by the decisions of other jurisdictions which already have grappled with the issue. We are particularly persuaded, for example, by the recent decision of the Supreme Court of Minnesota in *Board of Regents of the University of Minnesota v. Royal Insurance Co.,* 517 N.W.2d 888 (Minn.1994).

At issue in *Board of Regents* was an almost identical pollution exclusion, which applied to the discharge of "irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water." 517 N.W.2d at 890. The subject damage occurred when the insured's fireproofing material installed inside a building released asbestos fibers within the building. *Id.* The insurer argued, *inter alia,* that the discharge of asbestos into the building's air was a discharge into the "atmosphere," and that therefore the pollution exclusion applied to deny coverage. The supreme court rejected this contention, and explained that "atmosphere" as used in the pollution exclusion reasonably may be defined more narrowly.[3]

**2.** Both parties have cited the few Pennsylvania cases involving pollution exclusions. The pollution exclusions in these cases included an exception for "sudden and accidental" discharges or emissions. *See, e.g., O'Brien Energy Systems, Inc. v. American Employer's Ins. Co.,* 427 Pa.Super. 456, 629 A.2d 957 (1993) ("sudden and accidental" exception to pollution exclusion is unambiguous and does not apply to gradual migration of methane gas from landfill that ultimately caused explosion; coverage denied); *Lower Paxon Township v. United States Fidelity & Guaranty Co.,* 383 Pa.Super. 558, 557 A.2d 393 (1989) (same); *Techalloy Co. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984) (pollutant contamination occurring over 25 years is not "sudden and accidental" so that exception to pollution exclusion is not applicable and coverage is denied). In this case, the pollution exclusion does not contain the "sudden and accidental" exception, nor is there an issue as to whether the "occurrence" was sudden and accidental. Thus the discussion in these decisions regarding the "absolute" nature of the pollution exclusion, or the fact that the exclusion is "unambiguous," does not apply under the circumstances of this case.

**3.** With this holding, the Supreme Court of Minnesota reversed the decision of the court of appeals in *Board of Regents of the University of Minnesota v. Royal Ins. Co.,* 503 N.W.2d 486 (Minn.App.1993) (pollu-

"Atmosphere" (in its ordinarily understood physical sense) is another name for "air," but—and this is what is important—it is air thought of as being in a particular place. We would not say that the atmosphere in a room is stuffy. We think of atmosphere as the air surrounding our planet, as when Hamlet spoke of "this most excellent canopy, the air." (Act II, scene ii.) So it is that we speak of releasing a balloon into the atmosphere but letting the air out of a tire. Our problem here is how the term "atmosphere" should be understood in a pollution exclusion.

This much is clear. The pollution exclusion is directed—at least it was initially—at claims involving the pollution of the natural environment. Thus the exclusion is worded broadly to encompass the natural resources of this planet in their natural setting, namely, land, the atmosphere, and bodies of water. It is less clear, however, whether the exclusion was meant to include contamination of these resources outside their natural setting.

Significantly, the pollution exclusion does not use the generic term "water" but rather the phrase "any watercourse or body of water," a description indicative of water in streams, ponds or lakes. The use of the term "land," instead of "property," whether real or personal, likewise appears directed at land as a natural resource. And, within this context, the term "atmosphere," we think, refers to the ambient air.

We are not saying here that air inside a building differs from the air outside, or that the inside and outside air do not intermingle. Rather, within the context of the pollution exclusion, the distinction is not in the air itself but where the air happens to be. When the air supply within a building becomes contaminated, it is harmful to the controlled environment of that building; but the contamination of the air in a building is not harmful to the surrounding natural environment, at least not until it escapes into that

tion exclusion applies to deny coverage to insured where damages arose from discharge of asbestos fibers inside building). We note that appellant relied upon the latter decision in making its argument to this court.

environment so as to cause personal injury or property damage—a claim not made here. We conclude, therefore, that the term "atmosphere" in the pollution exclusion does not exclude coverage under the primary policies [4] for the contamination or pollution of air within a building.

At one level, the distinction we make may seem to draw a fine line. But words are deliberately chosen in insurance policies to make distinctions, and we think the construction we have given the word "atmosphere" here is contextually sound and functionally pertinent.... [W]hen the word "atmosphere" is read as part of the whole clause (i.e., "into or upon land, the atmosphere, or any water course or body of water"), "it is readily apparent that the pollution exclusion applies to property damage arising from the discharge of pollution into the external environment, or onto some part thereof, rather than the release of asbestos fibers within a building."

517 N.W.2d at 892–93 (quoting from *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 287, 578 N.E.2d 926, 933 (1991)) (footnotes omitted).

Other courts have utilized similar reasoning in holding that the pollution exclusion does not apply to deny coverage for pollutant release within buildings. *See, e.g., Essex Ins. Co. v. Avondale Mills, Inc.*, 639 So.2d 1339 (Ala.1994) (the plain meaning of the term "atmosphere" within the context of the policy language would not include the internal environs or surroundings of individual buildings and cannot be held to deny coverage for exposure to asbestos fibers); *Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 654, 609 N.E.2d 506, 513, 593 N.Y.S.2d 966, 973 (1993) ("the three places for discharge contemplated by the policy exclusion— into or upon land, the atmosphere, or any water course or body of water—read together support the conclusion that the

4. The court went on to hold that coverage was in fact barred under the excess insurance policies, as those pollution exclusions were unambiguous and applicable. 517 N.W.2d at 893.

clause was meant to deal with broadly dispersed environmental pollution," not dispersal of asbestos inside a building).

We are aware that still other courts have decided the issue differently. *See, e.g., Essex Ins. Co. v. Tri-Town Corp.*, 863 F.Supp. 38 (D.Mass.1994) (pollution exclusion applies to deny coverage for emission of carbon monoxide inside ice skating rink when Zamboni machine malfunctioned; emission was into "atmosphere"); *Prudential–LMI Commercial Ins. Co. v. Meadowood Condominium Ass'n*, Civ. A. No. 91–3848, 1992 WL 189490 (E.D.Pa. Aug. 3, 1992) (coverage denied under pollution exclusion for damages arising out of release of insecticide into apartment building). However, these cases do not include any discussion of the term "atmosphere" or its potential ambiguity, and that is the precise issue here.[5] Moreover, neither case is binding upon this court.

More important than the actual holdings by other courts is the fact that their decisions demonstrate the existence of an ambiguity in the crucial term "atmosphere." Our law provides that in the event of such ambiguity, and in the absence of extrinsic evidence on the term's meaning, we must construe the term against the drafter/insurer and in favor of the insured. *See Standard Venetian Blind, supra*, 503 Pa. at 300, 469 A.2d 563; *DiFabio, supra*, 366 Pa.Super. at 590, 531 A.2d 1141. The record in this case reveals no useful extrinsic evidence that could shed light on the meaning of the word "atmosphere." We therefore hold that the trial court properly entered summary judgment in favor of appellee Gamble Farm Inn.

We note that this result makes sense within the insurance context. An insurer contracts with an insured to provide coverage for certain risks, in return for payment of premiums which are calculated based upon those risks. It is reasonable

5. In fact, the pollution exclusion at issue in *Prudential* does not even use the term "atmosphere" but rather excludes coverage for claims "arising out of the ... dispersal ... of pollutants ... at or from any site or location on which [the insured] ... is performing operations if the pollutants are brought on or to the site or location in connection with such operations." 1992 WL 189490 at 1. The occurrence in *Prudential* —the intentional use of an insecticide on the apartment premises— clearly is covered by the exclusion's language.

and understandable that, when issuing an ordinary commercial CGL policy, an insurer undertakes to cover the risks which may occur within a building—a finite, measurable space with certain risks, such as fire or flood. The insurer attaches a pollution exclusion to such a policy because the damage caused by *environmental contamination* can be the kind of catastrophe the coverage of which is not undertaken by the insurer under normal commercial circumstances; the premiums on an ordinary commercial policy would not reflect the costly coverage of such a risk. However, where large-scale environmental pollution is an appreciable risk, for example where the insured is a nuclear energy producer or a hazardous waste disposal company, the insurer may issue a specific kind of coverage, and charge the insured accordingly.

The pollution exclusion in this case, within the context of an ordinary commercial CGL policy, understandably protects the insurance company from having to pay for losses that are in the nature of an environmental catastrophe—pollution of land, atmosphere, and bodies of water. However, the law does not permit the insurer, by hiding behind the language of its pollution exclusion, to eliminate its responsibility to its insured for the type of loss suffered by appellee. An attempt to apply the exclusion under these circumstances appears to be an afterthought, based upon ambiguous language, rather than the express purpose for which the exclusion was drafted. In such cases, the insured must prevail.

Order affirmed.