

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-2004

# JC Penney Life Ins v. Pilosi

Precedential or Non-Precedential: Precedential

Docket No. 02-4204

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"JC Penney Life Ins v. Pilosi" (2004). *2004 Decisions.* Paper 5.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/5

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 02-4204 & 02-4298
_____

J.C. PENNEY LIFE INSURANCE COMPANY

Appellant in No.  02-4298

v.

CHRISTIAN J. PILOSI; JAMES C. PILOSI,

Appellants in No. 02-4204
_____

Appeal from the United States District Court
For the Middle District of Pennsylvania
D.C. No.: 00-cv-01752
District Judge: Honorable Christopher C. Conner
_____

Argued: September 22, 2004
Before:  McKEE, ROSENN, and WEIS, Circuit Judges

(Filed: December 28, 2004)


James D. Crawford (Argued)
Schnader, Harrison, Segal & Lewis
1600 Market Street Suite 3600
Philadelphia, PA 19103

Brian J. Cali
103 East Drinker Street
Dunmore, PA 18512

Daniel T. Brier
Donna A. Walsh
Myers, Brier & Kelly
425 Spruce Street Suite 200
Scranton, PA 18503

 *Counsel for Christian J. Pilosi, James C. Pilosi*

Arthur F. Fergenson (Argued)
Piper Rudnick
6225 Smith Avenue
Baltimore, MD 21209

Ronald P. Schiller
Piper Rudnick
1650 Market Street 4900
One Liberty Place
Philadelphia, PA 19103

 *Counsel for J.C. Penney Life Ins. Co.*

_____

OPINION OF THE COURT
_____

ROSENN, Circuit Judge.

 This litigation has its genesis in an optimistic gambling junket to Atlantic City and a return flight that ended tragically in death. The ill-fated flight was part of a bi-weekly shuttle operated by Executive Airlines ("EA") on behalf of Caesars Casino ("Caesars"). Elaine Pilosi, a passenger on the junket, lost her life when the EA airplane in which she was traveling crashed. Mrs. Pilosi left two sons who were the beneficiaries of an

accidental death insurance policy that she had purchased from the defendant, J.C. Penney Life Insurance Company ("J.C. Penney Life" or "the Insurer"). The policy had three categories of losses, two of which are pertinent in this litigation. Part I provided benefits of $1 million for accidental death in "a public conveyance . . . operated by a duly licensed common carrier for regular passenger service." Part II provided for payment of $100,000 for accidental death in a private passenger automobile. And Part III provided for the payment of $50,000 for all other injuries.

J.C. Penney Life paid $50,000 under Part III of the policy and rejected the claim of the Pilosi brothers ("Pilosis" or "Insured") for $1 million under Part I. The Insurer sued for a declaratory judgment pursuant to 28 U.S.C. § 2201 in the United States District Court for the Middle District of Pennsylvania seeking a determination that the Pilosis were not entitled to the $1 million benefit. The Pilosis responded and also raised affirmative defenses asserting, inter alia, that J.C. Penney Life's claim is barred by the doctrine of waiver and/or estoppel, by its own bad faith, and by the doctrine of frustration of the purpose of the contract. In addition, the Pilosis counterclaimed for breach of contract and bad faith denial of their claim under 42 Pa. C.S.A. § 8371.[1] The District

---

[1]42 Pa. C.S.A. § 8371 provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>> (2) Award punitive damages against the insurer.

3

Court, in a carefully considered opinion of a difficult case, entered summary judgment for the Pilosis in the sum of $1 million but rejected their claim under Pennsylvania law for bad faith damages. The Pilosis timely appealed the entry of summary judgment in favor of J.C. Penney Life on the bad faith claim, and J.C. Penney Life cross-appealed the entry of summary judgment awarding $1 million coverage. We affirm in part and reverse the summary judgment against J.C. Penney Life.

## I.

The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a), as the diversity and amount-in-controversy requirements were met.[2] This Court has jurisdiction under 28 U.S.C. § 1291, as an appeal from a final judgment that disposed of all parties' claims.

"Disposition of an insurance action on summary judgment is appropriate, when, as here, there are no material underlying facts in dispute." McMillan v. State Mut. Life Assurance Co. of Am., 922 F.2d 1073, 1074 (3d Cir. 1990). The only contested issue in the instant case involves the interpretation of the scope of coverage of the insurance contract. "The interpretation of the scope of coverage of an insurance contract is a

(3) Assess court costs and attorney fees against the insurer.

[2]The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and arises between citizens of different states. J.C. Penney Life, a corporation duly organized and existing under the laws of Vermont, and having its principal place of business in Texas, is a citizen of both Vermont and Texas. Both Pilosis are citizens of Pennsylvania.

question of law properly decided by the court, a question over which [this court] exercise[s] plenary review." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999); McMillan, 922 F.2d at 1074.

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the record, this Court must view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. Haugh v. Allstate Ins. Co., 322 F.3d 227, 230 (3d Cir. 2003).

Where federal jurisdiction is based on diversity of citizenship, as it is here, we apply the choice of law rules of the state in which the District Court sat. St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 n.3 (3d Cir. 1991) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). This action was instituted in the Middle District of Pennsylvania. Under Pennsylvania choice of law rules, an insurance contract is governed by the law of the state in which the contract was made. Crawford v. Manhattan Life Ins. Co., 221 A.2d 877, 880 (Pa. Super. Ct. 1966); McMillan, 922 F.2d at 1074. "An insurance contract is 'made' in the state in which the last act legally necessary to bring the contract into force takes place." Crawford, 221 A.2d at 880. "In most cases, this last act is delivery of the policy to the insured and the payment of the first premium by him." Ruhlin v. N.Y. Life Ins. Co., 106 F.2d 921, 923 (3d Cir. 1939).

In the instant case the policy makes no mention of insurance coverage being

5

contingent upon delivery of the policy. However, the policy provided that coverage "will become effective on the Certificate Effective Date shown on the Schedule Page provided [that J.C. Penney Life] receive[s] the initial premium within 21 days of the Certificate Effective Date and while you are alive." The Certificate Effective Date was two days after Mrs. Pilosi orally accepted J.C. Penney Life's telephone solicitation offering three months of coverage at no cost and no obligation to continue. Payment of the first three monthly premiums was made by Mrs. Pilosi's credit card company as part of a promotion that it offered in conjunction with J.C. Penney Life. Because the first three premium payments were automatically triggered upon Mrs. Pilosi's oral acceptance, the last act legally necessary to bring the contract into force was Mrs. Pilosi's telephonic acceptance of the policy. This occurred at her residence in Pennsylvania. Therefore, Pennsylvania law governs construction of the terms of the insurance policy.

## A. "Public Conveyance"

The threshold issue is whether the EA airplane in which Mrs. Pilosi died qualifies as a "public conveyance." Counsel for the Pilosis strenuously argue that, much like a taxicab, the airplane was a public conveyance. Although Caesars controlled who was allowed to board this particular flight, the Pilosis assert that the airplane was available for any member of the public at-large to charter before and after the Caesars flight. On the other hand, the Insurer contends that the airplane was not a public conveyance because members of the public at-large were not free to purchase tickets for the flight.

6

Unfortunately, the policy does not define "public conveyance." However, the record reveals that the carrier was, indeed, a public conveyance. The airplane in which Mrs. Pilosi was traveling was owned and operated by an air carrier licensed by the Federal Aviation Administration to conduct common carriage. The airplane belonged to a company that was engaged in the business of hiring out airplanes for general public use.

More importantly, EA made its services available to the general public. According to the deposition of EA's CEO, Michael Peragine, EA was open to "anyone who had money who wanted to fly." Thus, EA could be hired by anyone with the ability to pay, either before or after the Caesars flight. Analogous to a public taxicab, which the Pennsylvania Supreme Court has held to be a "public conveyance," Primrose v. Cas. Co., 81 A. 212, 214 (Pa. 1911), "[t]he use of no one of [EA's] machines was limited to any particular person, but anyone able to pay the price and privilege of riding in it . . . could do so." Id. at 213.

J.C. Penney Life challenges the taxicab analogy. It disputes the Pilosis' reliance on the holding in Terminal Taxicab Co., Inc. v. Kutz, 241 U.S. 252, 255 (1916). The issue in Terminal Taxicab was whether a taxicab company that offered its services to hotel guests pursuant to a contract with the hotel still retained its public character. The Court held that the taxicab company retained its public character even though it served primarily hotel guests. The Court noted that "[n]o carrier serves all the public. His customers are limited by place, requirements, ability to pay and other facts . . . ." Id.

7

J.C. Penney Life's efforts to distinguish Terminal Taxicab are unpersuasive. J.C. Penney Life distinguishes the Terminal Taxicab taxi from the EA airplane on the ground that anyone could access the taxis stationed in front of the hotel, while the airplane was restricted to Caesars passengers. J.C. Penney Life's insistence that a vehicle must be available for "walk-up passengers" in order to qualify as a "public conveyance" misses the point.

As both the Terminal Taxicab and Primrose Courts articulate, passenger limitations imposed by any particular customer with regard to any particular taxi ride – i.e., designating the passengers, the destination, and the schedule of the trip – do not negate the public character of the conveyance. Terminal Taxicab, 241 U.S. at 255; Primrose, 81 A. at 213-14; see also Brill v. Indianapolis Life Ins. Co., 784 F.2d 1511, 1514 (11th Cir. 1986) (holding that hiring a helicopter on a particular occasion limited the helicopter's "operation; however these limitations as to time, place and passengers were no different than those imposed on the taxi service discussed in Terminal Taxicab Co.. For purposes of the one flight . . . , the decedent and his employer had the exclusive use of the helicopter as to contents, direction and time of use. Their control was not so pervasive, however, as to negate the public character of [the helicopter's] service.").

J.C. Penney Life claims that the proper test to determine whether a conveyance is public or private is the extent to which the public has access to the conveyance. Under J.C. Penney Life's test, however, the plane qualifies as public because it can be accessed

by any member of the public who has the financial means to rent it.  J.C. Penney Life is insensible to the public nature of the air taxi because general members of the public may not board the flight on those occasions when Caesars charters the plane.  But being temporarily restricted to a paying client does not transform a public conveyance into a private carrier.  When a patron enters a public taxicab, the cab is effectively private for the duration of the fare.  However, once the fare is completed, anyone may hire the taxi.  The same goes for an air taxi, such as EA.  When the plane is engaged by a person, that person is the very public to which the plane is available.

The final indicator that EA's plane was a "public conveyance" is that Caesars did not use exclusively the particular aircraft employed for the fateful flight – the November 16 Echo Juliet.  J.C. Penney Life's assertion that the flight was private rather than public would be more persuasive if, instead of being available for public hire, the EA jet was reserved exclusively for Caesars.[3]  However, other members of the public in addition to Caesars could use the Echo Juliet plane when not otherwise committed.  Caesars merely procured EA's services on a regular basis.  We are therefore convinced that the plane was a public, rather than private, conveyance.  However, this conclusion does not resolve the

[3]  The essence of the concurrence is that "the restrictions here constitute a total and arbitrary exclusion of the general public to such an extent that no member of the public can exercise any control over the flights because Caesars has rendered them unto itself." (Concurrence at 7).  Like the usual taxicab passenger, Caesars may have control over the specific flight it chartered every two weeks, but flights during the rest of the day and the other thirteen days of the bi-weekly period  were available to the public  generally.  There is no evidence that Caesars had contracted for them or that EA's planes were totally operated for and in behalf of Caesars at all times.

issue, for we must examine other pertinent terms of the policy contract.

## B.  Interpretation of the Policy Language

We turn to the proper interpretation of the clause "operated by a duly licensed common carrier for regular passenger service."  A reasoned analysis reveals that "regular passenger service" modifies the adjective "licensed," so that coverage extends narrowly to those common carriers specifically licensed to conduct regular passenger service.

### 1.  Pennsylvania Law on the Interpretation of Insurance Contracts

Pennsylvania law, under which this insurance policy must be interpreted, provides several well-settled principles governing the interpretation of insurance policies.  As a threshold matter, "[t]he task of interpreting a contract is generally performed by a court, rather than by a jury.  The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument."  Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (citations omitted).  Where an insurance policy provision is ambiguous, it is to "be construed against the insurer and in favor of the insured . . . ."  McMillan, 922 F.2d at 1075; State Farm Fire & Cas. Co. v. MacDonald, 850 A.2d 707, 710 (Pa. Super. Ct. 2004).  An ambiguity exists when the questionable term or language, viewed in the context of the entire policy, is "reasonably susceptible of different constructions and capable of being understood in more than one sense."  Med. Protective, 198 F.3d at 103 (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997), in turn citing Gamble Farm Inn, Inc. v.

10

Selective Ins. Co., 656 A.2d 142, 143-44 (Pa. Super. Ct. 1995) (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986))).

Where, however, "the language of an insurance contract is clear and unambiguous, a court is required to enforce that language." Med. Protective, 198 F.3d at 103 (citing Standard Venetian Blind, 469 A.2d at 566). That is, "a court must refrain from torturing the language of a policy to create ambiguities where none exist." McMillan, 922 F.2d at 1075; MacDonald, 850 A.2d at 711. In addition, wherever possible, "a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions." Little v. MGIC Indemnity Corp., 836 F.2d 789, 793 (3d Cir. 1987). "The policy must be construed as a whole, not in discrete units." Giancristoforo v. Mission Gas & Oil Products, Inc., 776 F. Supp. 1037, 1041 (E.D. Pa. 1991) (citing Luko v. Lloyd's London, 573 A.2d 1139, 1142 (Pa. Super. Ct. 1990)). Thus, "[w]here the policy contains definitions for the words contained therein, the court will apply those definitions in interpreting the policy." Monti v. Rockwood Ins. Co., 450 A.2d 24, 25 (Pa. Super. Ct. 1982) (citing Adelman v. State Farm Mut. Auto Ins. Co., 386 A.2d 535 (Pa. Super. Ct. 1978)).

In the instant case, the policy requires that the insured must have been traveling in a public conveyance "operated by a duly licensed common carrier for regular passenger service by . . . air." The parties dispute which word the clause "for regular passenger service" modifies. The Pilosis argue that the phrase "for regular passenger service"

11

modifies "operated," meaning that the common carrier must be duly licensed and must be operated for regular passenger service. On the other hand, J.C. Penney Life argues that the disputed clause modifies "licensed," so a carrier is not covered unless its license specifically authorizes regular passenger service. Although the meaning of the clause is disputed, "[a] contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction." MacDonald, 850 A.2d at 710. When the disputed language is read in context with the policy's definitions, only one interpretation is reasonable.

As stated above, the insurance policy requires that the conveyance be "operated by a duly licensed common carrier for regular passenger service by . . . air." The policy, in turn, defines "common carrier" to mean "an air . . . conveyance operated under a license for regularly scheduled passenger service." Read in context, therefore, the phrase requires the airline to possess a license for regularly scheduled passenger service to qualify as "a common carrier for regular passenger service." There is no reasonable alternative interpretation. The explicit definition of "common carrier" is adequate to put the Pilosis on notice that there would be no coverage unless the carrier was licensed for regular passenger service. Peerless Dyeing Co., Inc. v. Indus. Risk Insurers, 573 A.2d 541, 544 (Pa. Super. Ct. 1990) ("When a word or phrase is specifically defined within the policy, that definition controls in determining the applicability of the policy.").

The Pilosis believe the policy language is ambiguous. They therefore urge

12

application of the rule of insurance construction that interprets policy clauses providing coverage in a manner which affords the greatest possible protection to the insured. See Geisler v. Motorists Mut. Ins. Co., 556 A.2d 391, 393 (Pa. Super. Ct. 1989). Although this rule does, indeed, represent the law in this area, application is warranted only where the language is, in fact, ambiguous. The canon does not apply where, as here, the language of the policy, viewed in context, is clear. Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co. of N.Y., 431 F. Supp. 1160, 1163 (E.D. Pa. 1977) ("[R]ule of strict construction against the insurance company has no application where the language is clear and unambiguous.") (citing Sidebothom v. Metro. Life Ins. Co., 14 A.2d 131, 132 (Pa. 1940)). The plain meaning of the phrase "operated by a duly licensed common carrier for regular passenger service," when viewed in conjunction with the definition of "common carrier," is that coverage extends only to those carriers that are licensed for regular passenger service. See Loomer v. M.R.T. Flying Serv., 558 A.2d 103, 105 (Pa. Super. Ct. 1989) ("Where the terms of the insurance contract are not ambiguous . . . [the] Court must read the policy in its entirety and give the words therein their plain and proper meanings.").

The interpretation suggested by the Pilosis fails to accord proper significance to the written contract, "historically . . . the true test of parties' intentions." Standard Venetian Blind, 469 A.2d at 567. To interpret the phrase as extending coverage beyond those airlines licensed specifically for regular passenger service renders the policy

13

definition of "common carrier" useless. Pennsylvania courts have held that "[n]o provision within a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it." Sparler v. Fireman's Ins. Co. of Newark, N.J., 521 A.2d 433, 438 n.1 (Pa. Super. Ct. 1987); see Quigley v. W. & S. Life Ins. Co., 7 A.2d 70, 72 (Pa. Super. Ct. 1939) ("[Courts] have no right to add anything to the insurance contract or to give it a construction that renders any part of it useless and unnecessary, if it can be reasonably construed just as written and without any change, addition or elimination."). Because J.C. Penney Life's policy language can be reasonable construed as written, no portion of its language should be ignored.

This is not a case where the insurance policy as a whole fails to provide the court with any additional tools to tease out the disputed phrase's alleged plain meaning. See McMillan, 922 F.2d at 1076 (construing an ambiguous, undefined provision of an insurance policy against the insurer because "[n]either the context of the rest of the policy nor any other evidence extrinsic to the phrase itself renders the meaning of [the disputed phrase] more conspicuous"). Rather, the definition of "common carrier" provides ample clarification of any ambiguity that may result from the distal placement of the modifier "for regular passenger service." Because the meaning of the disputed phrase is clear, this Court need not determine whether any reasonable person upon reading it could decide that it encompassed airlines operated for regular passenger service.

To be sure, the burden of drafting with precision rests with the insurance

14

company, the author of the policy. McMillan, 922 F.2d at 1076. However, where, as here, the scrivener has adopted precise language to accomplish its purpose of limiting coverage to those carriers licensed for regular passenger service, that intent must control. Accordingly, it was erroneous to have found the language of Part I of the policy ambiguous.

## 2. Rules of Statutory Interpretation

In addition to the plain language of the policy, rules of statutory interpretation demonstrate that the plane must be licensed for regularly scheduled passenger service. A general rule of statutory construction, the "doctrine of last antecedent," teaches that "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to and including others more remote." Resolution Trust Corp. v. Nernberg, 3 F.3d 62, 65 (3d Cir. 1993); see United States v. Hodge, 321 F.3d 429, 436 (3d Cir. 2003); Commonwealth of Pa., Dep't of Pub. Welfare v. United States Dep't of Health & Human Servs., 80 F.3d 796, 808 (3d Cir. 1996). This rule suggests that the clause "for regular passenger service" modifies the antecedent adjective "licensed," rather than the verb "operated," which is located distally in the middle of the sentence. See also 2A Norman J. Singer, Sutherland Statutory Construction § 47.33 (6th ed. 2000) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.").

To be sure, "this rule [of the last antecedent] is not an absolute and can assuredly

15

be overcome by other indicia of meaning . . . ." <u>Barnhart v. Thomas</u>, 124 S. Ct. 376, 380 (2003) (applying the rule of last antecedent to statutes). However, in this case other indicia point overwhelmingly towards the conclusion that the clause modifies the word "licensed." Even if we were to ignore the contrary meaning provided by the definition of "common carrier," construing the phrase as the Pilosis urge would contort the language beyond its limits because such an interpretation would require a reorganization of the clause. The rewritten phrase would read: "operated by a duly licensed common carrier <u>and</u> operated for regular passenger service." By contrast, interpreting the phrase to mean that the airlines must be licensed for regular passenger service requires no such reorganization. By rewriting the policy to read that EA was a "duly licensed carrier" and "operated for regular passenger service," the District Court created an ambiguity where one does not exist. See <u>Fosse v. Allianz Life Ins. Co. of N. Am.</u>, No. CIV.A. 93-CV-1110, 1994 WL 139413, at *3 (E.D. Pa. Apr. 20, 1994) ("An ambiguity does not arise simply because an alternative interpretation of a word can be created through reasoning that renders common words meaningless.").

In light of the plain language of the policy and the contextual clarity provided by the definition of "common carrier," coupled with the absence of any reasonable alternative interpretation of the coverage language, the policy is unambiguous in requiring that the flight be licensed for regular passenger service.

C. <u>"Regular Passenger Service"</u>

16

Both the plain meaning of the policy language and rules of statutory interpretation reveal that insurance coverage extends narrowly to those common carriers specifically licensed to conduct regularly scheduled passenger service. Furthermore, EA's license includes a significant provision that "[t]he certificate holder is not authorized and shall not . . . [c]onduct Scheduled Operations at Authorized Airports." But even assuming that coverage did extend to all licensed common carriers operating regularly scheduled passenger service, the Pilosis cannot overcome the reality that EA was not conducting regularly scheduled passenger service within the meaning of the policy and under the terms of its license.

The EA shuttle flew patrons from Scranton, Pennsylvania to Atlantic City, New Jersey on alternating Saturdays at 4:30 P.M., and returned the following morning at 2:00 A.M. Although the ill-fated flight was part of a regular pattern of flights engaged by the casino, EA did not dictate the schedule; rather, its client, Caesars, did. EA was operating a service for a client who hired the flight for its convenience on alternate Saturdays. There is a distinction between an airline that accommodates a client who regularly engages a flight once every two weeks and an airline that conducts regularly scheduled passenger service. We hold that when the time and destination of the service is dictated by the convenience or business of the charterer and the airline's license specifically prohibits regularly scheduled service at authorized airports, the service does not qualify as "regular passenger service" under the terms of the policy. Merely chartering a plane on a

17

regular basis does not transform an airline operating on-demand into a regularly scheduled service provider. See Fosse, 1994 WL 139413, at *2 (holding that where an air taxi service operated upon demand, it did not operate its flights pursuant to a set schedule).

As mentioned previously, EA provided on-demand air taxi service. (A489) EA was licensed as a "charter operation providing taxi services" under 14 C.F.R. § 135 (emphasis added). In addition, EA's FAA Air Carrier Operating Certificate designated the airlines as an on-demand air taxi. Moreover, the preliminary accident report filed by the National Transportation Safety Board described the aircraft as an on-demand charter flying a "non-scheduled" flight. Finally, the airline's Operations Specifications not only provided that EA "is not authorized and shall not . . . [c]onduct Scheduled Operations at Authorized Airports[,]" but defined a "scheduled operation" by an air carrier as one "for which the certificate holder or its representative offers in advance the departure location, departure time, and arrival location." 14 C.F.R. § 119.3. The facts of this case demonstrate that EA does not meet the definition of "regular passenger service."

To summarize, Part I of the policy provided benefits of $1 million for accidental death in a public conveyance operated by a duly licensed common carrier for regular passenger service. The EA flight was, indeed, a public conveyance, but was not "operated by a duly licenced common carrier for regular passenger service" as required by the plain language of the policy. Because all of the elements of Part I are not satisfied, it

18

was error as a matter of law to grant summary judgment in favor of the Pilosis on the issue of coverage.

### D. Bad Faith

Under Pennsylvania law, a plaintiff can only recover for bad faith of an insurer under 42 Pa. C.S. § 8371 if he or she shows, by clear and convincing evidence, that the insurer: (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim. W.V. Realty, Inc. v. N. Ins. Co., 334 F.3d 306, 311 (3d Cir. 2003) (citing Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)). Although the term "bad faith" is not defined by the Pennsylvania bad faith statute, Pennsylvania courts have interpreted it as "'any frivolous or unfounded refusal to pay proceeds of a policy.'" Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). The "clear and convincing" standard requires that the plaintiff show "that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." Bostick v. ITT Hartford Group, Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999). Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial. Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999).

Given that EA was not licensed for regular passenger service, J.C. Penney Life

19

had a reasonable basis for denying the Pilosis' claim under Part I of its policy. A reasonable basis is all that is required to defeat a claim of bad faith. Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 307 (3d Cir. 1995).

Admittedly, some of J.C. Penney Life's conduct may have created an appearance of bad faith. Although J.C. Penney Life's marketing material claimed that coverage applied broadly to any form of public transportation and any type of common carrier, company officials testified under oath that these statements were false, "probably false," or "not necessarily totally true," and that, in reality, the company applies a much narrower definition of "common carrier" in deciding claims.

J.C. Penney Life also appears to have taken inconsistent positions on whether the individual requirements of the policy were satisfied. For instance, J.C. Penney Life continued to argue that the EA flight was not a public conveyance despite the testimony of its employee that the plane met the definition of "public conveyance." In addition, J.C. Penney Life argued in an unrelated case that a helicopter must be certified under 14 C.F.R. § 135 in order to be a duly licensed common carrier. But in the instant case, J.C. Penney Life took the position that EA did not qualify as a common carrier in spite of its certification under 14 C.F.R. § 135.

However, even considering J.C. Penney Life's apparent inconsistencies, there is insufficient evidence from which a jury reasonably could conclude that it was unreasonable for J.C. Penney Life to deny the Pilosis' claim. Because the policy

20

precludes coverage, it was reasonable for J.C. Penney Life to challenge the Pilosis' Part I claim. As stated previously, a reasonable basis defeats a claim of bad faith. Horowitz, 57 F.3d at 307. See Hyde Athletic Indus., Inc. v. Cont'l Cas. Co., 969 F. Supp. 289, 307 (E.D. Pa. 1997) (although an insurance company has a duty to accord the interests of its insured the same consideration it gives its own interests, "an insurer is not 'bound to submerge its own interest in order that the insured's interests may be made paramount,' and an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage.") (quoting Cowden v. Aetna Cas. & Sur. Co., 134 A.2d 223, 228 (Pa. 1957)). Accordingly, we see no error in the District Court's conclusion that J.C. Penney Life is entitled to judgment as a matter of law on the bad faith claim.[4]

## II.

The District Court's grant of summary judgment in favor of the Pilosis on the amount of coverage is reversed because the Part I policy requirements were not satisfied. For the same reason, we affirm the District Court's denial of the Pilosis' bad faith claim. Each side to bear its own costs.

---

[4]Although oral argument on behalf of the Pilosis was presented ably and professionally, we note that their brief fails to comply with a number of local and federal appellate rules. The Pilosis' brief, inter alia, fails to inform us where in the record the issues were raised and ruled on, in violation of 3d Cir. L.A.R. 28.1(a)(1), the brief fails to include parenthetical descriptions of and citations to the record when making statements of fact, in violation of 3d Cir. L.A.R. 28.3(c), and the brief fails to set forth this Court's jurisdiction, in violation of Fed. R. App. P. 28(a)(4)(D). The local and federal appellate rules exist to facilitate the Court's review and to aid the speedy administration of justice. This objective is frustrated when the rules are ignored. We remind counsel who prepared the brief that adherence to appellate rules is not discretionary.

McKee, <u>Circuit Judge</u> concurring.

I agree that we must reverse the order granting summary judgment in favor of the insureds because they are not entitled to coverage under Part I of the insurance policy.  I therefore join Parts I.B and I.C of the majority opinion.  I also agree that the insureds have not made out their bad faith claim under 42 Pa. C.S. § 8371, and I therefore agree that we must affirm the district court's grant of summary judgment in favor of J.C. Penney Life on the insureds' bad faith claim.  However, I write separately because I do not agree that the plane that crashed qualifies as a "public conveyance," under the terms of the insurance policy.  Accordingly, I can not agree with the analysis in Part I.A. of the majority opinion.

## I.

According to J. C. Penney Life, Caesars Casino controlled who could board charter flights like the one at issue here.  No one could make a reservation for those flights.  Rather, Caesars' Pennsylvania marketing representative was responsible for the required coordination and arrangements. In order to travel on one of these charter flights, a person had to meet Caesars' definition of a qualified player for its gambling business, or be a guest of someone Caesars deemed a "qualified player."   Although it was not favored, Caesars would also allow passengers who, in Caesars' estimation, had the

22

potential to qualify as a "qualified player" or someone who was a guest of a "qualified player."  However, even some of Caesars regular customers might not qualify to travel on these charters.   J. C. Penney Life says that Caesars used the flight for its own interests to increase its gambling business.

According to J. C. Penney Life, no passenger ever paid a fare for any of these flights, and Caesars never sold any seats or packages in connection with the flights. Obviously, the flights were never advertised.  Rather, the flights were exclusively a "complimentary" perquisite that Caesars created and controlled, and doled out to those it defined as "high rollers" based upon its own customer ratings.  Given these restrictions, and the near total exclusion of the public,  the Executive Airlines ("EA") flight at issue here simply can not qualify as a "public conveyance."

## II.

The majority's conclusion that EA's flight does qualify as a public conveyance for purposes of Mrs. Pilosi's insurance policy rests in large part upon *Terminal Taxicab Co., Inc. v. Kutz*, 241 U.S. 252 (1916).  Although the analysis in *Terminal Taxicab* is similar to the inquiry required of us here,  I believe that it is of less value than at first appears. Moreover, to the extent that the discussion in *Terminal Taxicab* does assist our inquiry, I believe that the Court's holding there counsels that the charter flight at issue here was not a public conveyance within the meaning of J.C. Penney's life insurance policy.

Before discussing *Terminal Taxicab*, I think it important to note that the issue

23

there was not whether a given cab was a "public conveyance." Rather, the issue was whether the taxicab company was subject to the jurisdiction of the Public Utilities Commission of the District of Columbia. 241 U.S. at 253 (identifying the issue as "whether the plaintiff is a common carrier under the definition in the act."). In order to resolve that inquiry, the Court first noted that the cab company basically conducted three different kinds of business.

Thirty-five percent of the company's business involved the cab company's "exclusive right to solicit . . . taxi cab business from all persons passing to or from trains in the Union Station. . .". *Id*. at 254. Insofar as that portion of the cab company's business was concerned, the Court "assumed that a person taking a taxicab at the station would control the whole vehicle both as to contents, direction, and term of use, although not, so far as indicated, in such a sense as to make the driver of the machine his servant. . .". *Id*. The Court reasoned that this portion of the taxicab company's business was "an agency for public use for the conveyance of persons. . . and nonetheless that it only conveys one group of customers in one vehicle." *Id*. (Internal quotation marks omitted).

"The next item of plaintiff's business" consisted of "contracts with hotels by which [the cab company] agrees to furnish enough taxicabs. . . within certain hours reasonably to meet the needs of the hotel, receiving the exclusive right to solicit in and about the hotel but limiting its service to guests of the hotel." *Id*. at 254-5. This arrangement with hotels constituted approximately 25 percent of the company's business.

Although the public's access was limited by the terms of the company's exclusive arrangement with the hotel, that limitation did not remove the public character of the cab company's service because "[n]o carrier serves all the public. His customers are limited by place, requirements, ability to pay and other acts." *Id*. at 255. The Court stressed that "the public is generally free to go to hotels if it can afford to, and through the hotel door to call on the plaintiff for a taxicab." *Id*. Significantly for our purposes, the Court was reluctant to conclude that "either its contract or its public duty allowed it arbitrarily to refuse to carry a guest upon demand." *Id*. The Court went further and stated: "[w]e can only assume that in its own interest it does not attempt to do so." *Id*. Moreover, the Court added that, despite limitations arising from the exclusive nature of the company's contract with hotels, "[t]he service affects so considerable a fraction of the public that it is public in the same sense in which any other may be called so." *Id.*

Here, of course, EA not only "arbitrarily . . . refuse[s] to carry a guest upon demand," it refuses to carry anyone upon demand. That decision is the exclusive province of Caesars. Furthermore, it can hardly be said that the charter service provided to Caesars "affects so considerable a fraction of the public that it is public in the same sense in which any other may be called so."

This distinction is evident from the Court's analysis of the third part of Terminal Taxicab's business. As to the two parts I have mentioned thus far, the Court concluded that the cab company was "a common carrier" subject to the jurisdiction of the District of

Columbia Public Utilities Commission.

The court reached a contrary conclusion as to the remaining portion of the company's business. That 40 percent of the company's business "consists mainly in furnishing automobiles from its central garage on orders, generally by telephone." *Id*. The Court noted that the cab company "asserts the right to refuse the service, and no doubt would do so if the pay was uncertain, but it advertises extensively, and, we must assume, generally accepts any similarly solvent customer." *Id*. at 585.  Significantly for our purposes, the Court noted "[t]here is no contract with a third person to serve the public generally." *Id*. at 585-6.  The absence of a contract to serve the public generally and the authority to arbitrarily refuse service to anyone gave the Court pause in determining whether the company maintained its public character as to that portion of its business.  *Id*. at 585. ("The question whether, as to this part of its business, it is an agency for public use within the meaning of the statute, is more difficult").  However, the Court concluded that insofar as this remaining portion of the business was concerned, Terminal Taxicab was *not* a public utility because the company retained the right to arbitrarily refuse its services to any member of the public.  The fact that the company advertised its services to the public did not cause the Court to find that the company was therefore a *public* utility because "[a]n invitation to the public to buy does not necessarily entail an obligation to sell." *Id*. at 585.  As noted above, the Court focused on the company's ability to refuse those services to the public.  It concluded, "[i]t is assumed . . . that an

26

ordinary shopkeeper may refuse his wares arbitrarily to a customer whom he dislikes, and although that consideration is not conclusive, it is assumed that such a calling is not public as the word is used. In the absence of clear language to the contrary it would be assumed that an ordinary livery stable stood on the same footing as a common shop, and there seems to be no difference between the plaintiff's service from its garage and that of a livery stable." *Id*. at 256. Accordingly, the Court held that the taxicab company was not a public utility to the extent of the 40 percent of its business that was comprised of hiring cabs from its central garage.

Thus, I believe the majority's focus on testimony that EA was "open to 'anyone who had money and wanted to fly'" misses the point. *See* Maj. Op. at 7. The flights that Caesars chartered were clearly not open to anyone with money who wanted to fly. The fact that Mrs. Pilosi's plane "could be hired by anyone with the ability to pay, either before or after the Caesar flight," does not establish that the particular flight that Mrs. Pilosi was on was a "public conveyance" while it was under the exclusive use and control of Caesars Resort. *See* Maj. Op. at 7. The fact that the plane was a public conveyance sometime does not establish that it was a public conveyance all of the time. This is particularly true when it was totally inaccessible to the general public. This is not to say that a charter loses its public nature merely because it is hired by a particular person anymore than a taxicab loses its public nature when transporting a fare-paying passenger and under his/her direction. However, where, as here, a contract with a private party so

27

restricts access to a charter as to arbitrarily place it beyond the reach of the general public, it can no more be considered public than that portion of Terminal Taxicab's business that allowed it to arbitrarily refuse service to members of the public.

Furthermore, Caesar's charter fails to qualify as "public" even if we compare it to the public components of Terminal Taxicab's business. The majority believes that *Terminal Taxicab* establishes that "passenger limitations imposed by any particular customer with regard to any particular taxi ride i.e. designating the passengers, the destination, and the schedule of the trip - do not negate the public character of the transportation." Maj. Op. at 8. I do not disagree. However, the restrictions here constitute a total and arbitrary exclusion of the general public to such an extent that no member of the public can exercise any control over the flights because Caesars has rendered them unto itself.

The flight in question was reserved for the exclusive use of high rollers whom Caesars identified. Those persons were then permitted to board a flight which was to depart at a time of Caesars' choosing, from a location of Caesars' choosing, to the destination of Caesars choosing. In *Terminal Taxicab*, any member of the general public with the ability to pay could reserve a room at a hotel under contract with the cab company and thereafter hire a cab so long as the hotel customer had the ability to pay. The same is true of those passengers hiring a taxi leaving a train station. Any member of the public with ability to pay could ride the train, and upon leaving the train station could

28

hire a taxi to go to a location he/she desired.  Here, unlike in *Terminal Taxicab*, "[t]here is no contract with a third person to serve the public generally." *Terminal Taxicab*, 241 U.S. at 255.  Rather, here, the contract with the third person allows the public to be totally and arbitrarily excluded.

The majority states that "the plane qualifies as public because it can be assessed by any member of the public who has the financial means to rent it."  Maj. Op. at 8.  That statement is simply not supported by the record.  A billionaire may well have been refused transportation if he/she only patronized one of Caesars' competitors and informed Caesars that he/she had absolutely no intention of visiting its casino.  The Court in *Terminal Taxi* merely assumed that the company could arbitrarily exclude members of the public from its livery services. Here, there is no need to assume.  The right to exclude is endemic in the very nature of the these flights.

The majority also relies upon *Primrose v. Casualty Co. of America*, 81 A.212 (Pa. 1911).  There, Primrose was killed when the car he had hired from a taxi company crashed. At the time of the accident, Primrose was covered by an insurance policy that included a double indemnity for injuries "received while riding as a passenger in a public conveyance provided for passenger service. . .". *Id*.  On appeal, the Pennsylvania Supreme Court had to determine whether the taxicab constituted a "public conveyance" within the meaning of decedent's insurance policy.  The court concluded that it did because "Anybody at all, who was financially responsible could hire [a cab]. . . . They

29

would be hired to any one for rides or for other personal transportation as passengers, from wherever they might get them to wherever they might want to go." *Id.* at 215 (internal quotation marks omitted). Although all the rest of the public was obviously excluded while the car was hired by a given passenger, "[t]he use of no one of the [cabs] was limited to any particular person, but anyone able to pay the price for the privilege of riding in it, [was able to do so]." *Id.* I have already explained why that is simply not the case here.

Similarly, I do not agree that *Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511 (11ᵗʰ Cir. 1986) supports the majority's conclusion that the chartered flight here was a "public conveyance." In *Brill*, a chartered helicopter crashed while carrying passengers from a hotel to an airport. A clause in the applicable insurance policy required that the amount of the death benefit be doubled if an insured sustained an injury while a "*fare paying passenger* in a *public conveyance. . .*". *Id.* at 1512 (italics in original). The court relied upon *Terminal Taxicab* in holding that the helicopter was a public conveyance within the meaning of the insurance policy. Although the passengers received no tickets, checked no baggage, and were charged a flat hourly rate, the charter company regularly advertised its charter services to the public. This included advertisements in "[the] equivalent of the yellow pages, business and trade journals, as well as newspapers [intended for general circulation]." *Id.* at 1512. The court held that the limitations placed on the helicopter as to time and place were no more restrictive than the limitations placed

on the taxicab in *Terminal Taxicab* and that the helicopter was therefore a public conveyance despite the limitations and exclusions that resulted from it being used as a charter. The court reasoned that, although the decedent and his employer "had the exclusive use of the helicopter as to its contents, direction and time of use. The control was not so pervasive . . . as to negate the public character of [the charter company's] service." 784 F.2d at 1514.

It is beyond dispute that the limitations here exceed the usual limitations inherent in charters that can be hired by any member of the public with ability to pay. Rather, the limitations here are more analogous to (and greatly exceed) the third component of Terminal Taxicab's business. As noted above, the Court there held the livery portion of the company's business was not a public utility because the company could arbitrarily refuse to serve any member of the paying public. Indeed, unlike the exclusive contracts between a taxi company and a hotel or a train station where exclusion is a convenience that assures availability to a broad and potentially unlimited sampling of the public, exclusion here is the raison d'etre of Caesars' charter. It is the exclusion of the public that makes Caesars' charters valuable. Moreover, the charter flight benefitted Caesars and a select few high rollers that Caesars chose for its own purposes. The flight did not benefit the universe of Caesars' patronizing public. Accordingly, I conclude that availability of Caesars' charter was so limited and exclusive that it can not be deemed a "public conveyance."

31